## COWEN et al. v. PADDOCK et al.

*(Supreme Court, General Term, First Department. December 31, 1891.)*

MECHANICS' LIENS—CONSENT OF OWNER OF PROPERTY.

> A contract by the owner of land for the sale thereof gave the purchaser no right to enter on the land, but he, without authority from the owner, commenced excavating thereon for the purpose of building. The owner, on becoming aware of the work, directed that it be stopped; but it was afterwards resumed, and foundation walls, vaults, etc., constructed, although it did not appear that this was known to the owner. The purchaser was finally ejected from the premises for failure to make payments required by the contract. *Held*, that these facts would not sustain an inference of the "consent of the owner" to the doing of the work, required by the mechanic's lien law of 1885, § 1, to sustain a mechanic's lien therefor.

Appeal from judgment on report of referee.

Action by Charles A. Cowen, Andrew J. Post, William H. McCord, and George H. Griebel against Margaret Paddock, Allen H. Wood, Nelson Waldron, and Garrit J. Byrne, to foreclose mechanics' liens. On trial before a referee, the complaint was dismissed as to defendant Paddock, and judgment for said defendant was entered thereon. From the judgment plaintiffs appeal. Affirmed.

The following opinion was rendered by HAMILTON ODELL, Esq., to whom the cause was referred:

"This action is brought to enforce claims for labor and materials made by the plaintiffs against premises situated at the north-east corner of 7th avenue and 124th street, in the city of New York. Judgment is demanded that the interests of the defendants Paddock and Wood in the said premises be sold as provided by law, and that from the proceeds of such sale the plaintiffs be paid the amounts of their respective liens, and that, in case of a deficiency of proceeds, they have judgment therefor against the defendant Wood. It is alleged in the complaint that, at the times the said labor and materials were furnished, the defendant Paddock was, and that she still is, the owner of said premises in fee; that the defendant Wood was in possession thereof, with Mrs. Paddock's consent, under an agreement to purchase the same; that said labor and materials were furnished by the plaintiffs under contracts made by them with the said Wood, and were rendered and used in or towards the erection of a building upon said premises with the consent of Mrs. Paddock, the owner. She, in her answer, denies such alleged consent. Whether or not it was given is the single question raised by her motion to dismiss the complaint upon the proofs submitted by the plaintiffs.

"Chapter 342 of the Laws of 1885 provides that any person who shall perform any labor or furnish any materials used, or to be used, in erecting any house or building, or appurtenances to any house, building, or building lot, ' with the consent of the owner' or his agent, may, upon filing a notice of lien, have a lien for the price or value of such labor or materials upon such house, building, or appurtenances, and upon the lot or premises upon which the same may stand or be intended to stand, to the extent of the right, title, or interest at that time existing of such owner; and it is declared that an owner who has contracted to sell and convey the premises to another person shall be deemed to be the owner, within the intent and meaning of the act, until the deed conveying the premises pursuant to such contract has been actually delivered and recorded. The question in dispute is, what constitutes consent? This question is described by the defendant's counsel as 'both lexicographical and juridical.' He contends that 'consent' is used in the statute in what may be called its 'scientific sense,' and refers to Crabb's English Synonymes to show that there is a recognized and real difference in meaning between 'consent' and other words of similar import which are frequently, if not commonly, used as its equivalents. In his preface the learned author of that excellent work explains his business to be ' to mark the nice shades of distinction between words closely allied,' and his book contains no better illustration of his acuteness and skill than will be found in his treatment of the allied words, ' assent,' ' consent,' ' permit,' and ' allow.' 'As the act of an equal, [he says,] we *consent* to that in which we have a common interest with others; we *permit* or *allow* what is for the accommodation of others; we *allow* by abstaining to oppose; we *permit* by a direct expression of our will; contracts are formed by the *consent* of the parties who are interested.  *  *  *  *Consent* respects matters of serious importance; *permit* and *allow* regard those of an indifferent nature; a parent *consents* to the establishment of his children; he *permits* them to read certain books; he *allows* them to converse with him familiarly.  *  *  *  *Assent* may be given to anything, whether positively proposed by another or not; but *consent* supposes that what is *consented* to is proposed by some other person.' It is doubtful if the legislature in making laws uses language with such scrupulous exactness. Certainly in interpreting them the courts are apt to indulge in free translations. 'The words of a statute, if of common use, are to be taken in their natural, plain, obvious, and ordinary signification.' *Holmes* v. *Carley*, 31 N. Y. 289. This rule seems to be peculiarly applicable in the construction of a statute which is declared to be a remedial statute, and which ' is to be construed liberally to secure the beneficial intents and purposes thereof.' Act 1885, § 25. In *Miller* v. *Mead*, (Sup.) 6 N. Y. Supp. 273, the court said that the difference between ' permission' (as used in the Kings county lien law of 1862) and ' consent' (as used the act of 1885) was in no respect material. The two words are treated as equivalents in *Rollin* v. *Cross*, 45 N. Y. 770. The learned counsel has cited *Ottiwell* v. *Muxlow*, (Com. Pl. N. Y.) 6 N. Y. Supp. 518, where the general term of the common pleas said that the meaning of ' consent' in the act of 1885 was well stated by the trial judge as follows: ' "Consent" implies a degree of superiority; at least, the power of preventing. It implies, not merely that the person accedes to, but authorizes, an act.' This may be so, but I am not able to agree with the counsel that an express authority or consent is necessary. An owner may be estopped or become bound quite as effectually by an ' implied consent,' which Bouvier defines to be ' that manifested by signs, actions, or facts, or by inaction or silence, which raise a presumption that the consent has been given.' Greenleaf says: ' Where a landlord quietly suffers a tenant to expend money in making alterations and improvements on the premises, it is evidence of his consent to the alterations.' 1 Greenl. Ev. § 197. In *Husted* v. *Mathes*, 77 N. Y. 390, the court said that consent may be implied from knowledge, and

that, in the absence of any objection, silence may be deemed sufficient evidence of assent. In *Nellis* v. *Bellinger*, 6 Hun, 561, the plaintiff claimed a lien (under chapter 402, Laws 1854) upon land belonging to the defendant for labor performed by the plaintiff upon a house which the defendant's son had caused to be erected upon such land for his own use. The trial court found as facts that the defendant was present on several occasions while the work was in progress, and rendered some assistance in the erection of the house, and made no objection to the work being done, 'and thereby consented to the performance of said work.' On appeal the court held that the evidence clearly manifested the consent which the statute required, and said: 'The statute now gives a lien as well when the owner of land consents to the erection of a structure upon it as when he contracts directly for its construction, and such consent of the owner may be proved by the fact that he entered into such contract, or by other acts or declarations, as well as by direct evidence.' Where premises were rented to be used for a particular purpose, and no other, and the landlord, without objection, allowed the tenant to expend a considerable sum of money in fitting up the property for a different use and purpose, it was held that he had consented to the change, and was estopped from denying the tenant's right to devote the property to the new use. *Malley* v. *Thalheimer*, 44 Conn. 41. *Qui tacet consentire videtur* is an old and familiar maxim of the law, and the books abound in instances of its application. The Massachusetts decisions, cited by defendant's counsel, seem to be at variance with the doctrine of the cases in our own courts, above referred to. See, also, *Burkitt* v. *Harper*, 79 N. Y. 273.

"But I am unable to find in the plaintiffs' proofs any evidence, either of an actual consent by the defendant Paddock to the making of the improvements in the course of which the work was done and the materials furnished, for which the plaintiffs claim a lien, or of such knowledge thereof, followed by silence or acquiescence on her part, as warrants the inference of such consent. What are the facts? On the 18th of February, 1889, Mrs. Paddock contracted to sell the lots in question to the defendant Wood for the sum of $110,000, of which sum $5,000 was to be paid at the time of the execution of the contract, and $15,000 on the delivery of the deed on the 16th day of April. The balance of the purchase money was to remain on bond and mortgage. Wood was unable to make the payment of $5,000 in cash on the signing of the contract, and persuaded Mr. Lanning, who was Mrs. Paddock's agent and representative in the transaction, to accept for that sum the note of himself and one Louis Bresler, payable in thirty days from date. It was clearly understood by all the parties that the purchase was made by Wood for the purposes of a theater which he intended to build upon the premises, and that he was eager to commence work without delay, so that he might complete the building and open it by the following October. The contract gave him no right of entry or possession, and Lanning testified that he (Wood) 'was not to go on the property until the $5,000 note was paid, and then he could not do anything but excavate the foundation. * * * I told Mr. Wood that upon the payment of that note he could excavate for a foundation; that there was nothing to be done—no entrance to be had on the property—until that $5,000 was paid.' In answer to the question put to him by plaintiffs' counsel, 'He had authority for the excavation, had he not?' the witness answered: 'Not until that note was paid. He had no right to touch a shovel of dirt or to go upon the premises; and then he was told that no stone must be laid, no foundation must be laid. After that note, if the note had been paid,—if the $5,000 had been paid in cash,—he could excavate only; but no foundation must be laid until the contract was fulfilled and he had taken his deed. He was told that at Mr. Freeman's office.' Wood told Lanning that he would be able to pay the note before it became due out of the proceeds of property which his co-maker, Bresler, had already sold in Detroit. A portion of the premises was occupied

by a tenant under an agreement which entitled him to a month's notice to quit. As soon as the contract was signed, Lanning, for Mrs. Paddock, gave formal notice to the tenant that he must remove from the premises on or before the 21st day of March. This was so that Wood might be put into full possession on his completion of the contract. Wood seems to have commenced the work of excavation about the 1st of March, before any payment had been made upon the note, and without any permission from either Mrs. Paddock or her agent, Lanning. The fact that he was so engaged came to the knowledge of Mrs. Paddock about two weeks later. She visited the premises in company with Mr. Lanning, and saw the work of excavation going on. Her testimony is that she then protested to Mr. Lanning, and told him that she wanted the work to stop. Mr. Lanning testifies that he did order the men to stop work. He says: 'I ordered them to stop; that that note had not been paid; and that no more work must be done on there until that note was paid.' The work was in charge of a man named Hough, who was examined as a witness. His testimony varies somewhat from that of Lanning, and is as follows: 'He [Lanning] told me to tell Mr. Wood that if a certain $5,000 was not forthcoming he would stop us immediately at work. "If I don't get it in the morning," he says, "I will stop you to-morrow morning." At first he told me to stop work immediately, and then he said to go on, and he would see Mr. Wood in the morning; and, if the $5,000 were not forthcoming, we should have to stop work,—for me to tell Mr. Wood that.' If it were necessary to determine whether Lanning or Hough states the occurrence with greater accuracy, I should have no hesitation in accepting Mr. Lanning's version as much more in accordance with plain probabilities; but, even if Hough's version be the true one, it wholly fails to show any assent to the situation on the part of Mrs. Paddock. All that she did was to object and protest to Mr. Lanning that she wanted the work to stop, and it is plain from her testimony that she understood that he had communicated her protest to the man in charge. I can find in the proofs no satisfactory evidence that the entry of Wood upon the premises was with Mrs. Paddock's permission, or that any part of the work of excavation was done with her consent. What proof is there that she consented to the construction of the foundation walls and vaults and other work for which the plaintiffs claim their liens? In *Burkitt* v. *Harper*, 79 N. Y. 273, the court referred to the facts that 'the lessors [the defendants] lived near the premises, and saw the building from time to time while plaintiff was engaged in its erection, and made no objection to the erection of the same.' In *Husted* v. *Mathes*, 77 N. Y. 388, the defendant Catherine Storms knew that her husband was building the house upon her lot. She lived but about a quarter of a mile away from where the house was being built, and made no objection. The court said that she 'received the benefit willingly.' In *Otis* v. *Dodd*, 90 N. Y. 338, Judge EARL said that 'during the progress of the work on the improvements, and about the time of the commencement thereof, the lessors [the defendants] came upon the premises, and advised about the location of the structures, and gave some directions as to the method of their construction.' And in *Nellis* v. *Bellinger*, 6 Hun, 560, the defendant (the owner of the land) knew that his son was building a house thereon, and was present on several occasions during the progress of the work, and rendered assistance in the erection of the house, and resided in the neighborhood, and made no objection to the work being done. 'The evidence shows [the court said] that the defendant was willing to have the house built upon his land, and encouraged the building of it.' The present case is barren of any such facts. Mrs. Paddock did not reside in the neighborhood of these premises. She visited them but once after the date of the contract of sale, and then made objection to the work of excavating that was being done by Wood without authority. It does not appear that she had any knowledge that the work of building the foundation walls was being proceeded with by Wood. Lanning.

her agent and attorney, resided in New Jersey. He testified that he did not know that the foundation of the building was being laid until it was nearly level with the sidewalk. When he heard of it he ʻwent up there,' he says, and told the man in charge of the work that it must be stopped. He also saw Bresler, Wood's father-in-law, who was assisting Wood in the enterprise, and who, with Wood, signed the $5,000 note, and told him that he had ʻ ordered the work to be stopped, and that it must be stopped.' Doubtless Mrs. Paddock and Mr. Lanning might have expressed their opposition to Wood's energetic proceedings in some more forcible and effective manner, but what they did was quite sufficient to prevent the inference that they ʻconsented' to any portion of the work or materials for which the plaintiffs seek to recover in this action. The consent to the laying of the corner-stone, given by Mr. Abbott a few days prior to the 10th of June, does not atone for the plain deficiencies of the plaintiffs' case. The motion to dismiss the complaint as to the defendant Paddock is therefore granted."

Argued before VAN BRUNT, P. J., and BARRETT and ANDREWS, JJ.

*Cannon & Atwater*, (*Henry G. Atwater*, of counsel,) for appellants. *Souther & Stedman*, (*Charles Edward Souther*, of counsel,) for respondent Paddock.

ANDREWS, J. This action is brought to foreclose certain mechanics' liens. All the issues were referred, by consent, to Hamilton Odell, to hear and determine the same. After plaintiffs' counsel had introduced a large amount of testimony, counsel for the defendant Paddock inquired whether the plaintiffs' counsel intended to introduce any further evidence to prove that the defendant Mrs. Paddock, who was the owner of the land upon which the work had been done, ever gave her consent to the doing of the work. Plaintiffs' counsel replied that he did not intend to introduce further testimony upon that point, and thereupon counsel for defendant Paddock moved to dismiss the complaint as to that defendant, which motion was granted. Subsequently judgment was entered in favor of the defendant Paddock, dismissing the complaint upon the merits as to her, and for costs, and from such judgment this appeal was taken.

The defendant Mrs. Paddock was the owner of certain lands situated at 7th avenue and 124th street, in the city of New York, and sold the same to the defendant Wood. Mrs. Paddock resided in New Jersey, and did not personally make such sale, but was represented by Mr. Lanning, who was an attorney at law, and also resided in New Jersey. The agreed price for the property was $110,000, which was to be paid as follows: $5,000 on the execution of the agreement, $14,200 by assuming a mortgage on the premises, $75,800 by a mortgage to be given, and $15,000 in cash when the deed was delivered. The contract of sale was signed on February 18, 1889; but Wood was not then able to pay the $5,000, and induced Lanning to accept a note for $5,000, dated February 19, 1889, signed by Wood and his father-in-law, one Bresler, payable 30 days from date. Five hundred dollars was paid upon the note on March 6, 1889, but the balance was not paid when the note became due, on March 19th. On March 21, 1889, after urgent demands of payment had been made upon him, Wood paid $1,200 on account of the note, and on March 25, 1889, the remaining $3,300. The deed of the property was to be delivered on April 16, 1889, but Wood was not able to pay at that time, or at any subsequent time, the $15,000 in cash which the contract provided should be paid when the deed was delivered, and such deed never was delivered. Wood purchased the lots with the intent to erect a theater thereon, and was anxious to commence work at once, in order that such theater might be completed in the following October. The contract of sale did not give Wood the right to enter upon the land, but it appears that about the 1st of March workmen employed by him commenced excavating upon the land.

Lanning, according to his own testimony, had no authority to accept the note, but did accept the same, without the knowledge of the defendant Paddock; nor did he have any authority to vary the terms of sale above set forth, and which had been approved by the defendant Paddock; nor, so far as appears by the evidence, had he any express authority to authorize Wood to enter upon the land before the delivery of the deed. Lanning swears positively that when the defendant Wood applied to him for leave to enter upon the land to commence work at once he told Wood that he could not so enter, or do any work whatever upon the land, until the note for $5,000 had been fully paid. The defendant Wood, on the other hand, testifies that he understood he was authorized to commence work as soon as the contract of sale had been signed. There is no evidence to show that either the defendant Mrs. Paddock or Lanning knew that work had actually been commenced until about the middle of March, when they visited the premises in question together. At that time one Hough was on the premises, superintending the work of excavation which was then going on. Mrs. Paddock testifies that she told Lanning that the work must be stopped, and Lanning testifies that he told Hough to stop work immediately. Hough's version of the conversation between himself and Lanning differs somewhat from that given by the latter. His recollection was that Lanning had first told him to stop work at once, but afterwards he told him to go on, and that he (Lanning) would see Mr. Wood in the morning, and, if the $5,000 were not forthwith given, he should have to stop work; for him to tell Mr. Wood that. The referee was of the opinion that Lanning's testimony was more in accordance with the probabilities of the case, and that, even accepting Hough's version of the matter, it did not show any consent on the part of Mrs. Paddock that the work should proceed. Subsequently, when the note was not paid at maturity, Lanning sent peremptory word that the work must stop, and it appears to have stopped until the $5,000 was fully paid. Afterwards foundation walls and vaults were constructed, and some other work was done upon the property; but the evidence leaves it in doubt whether the defendant Mrs. Paddock even knew that such work was being done. There is no evidence that she visited the property again, or that she personally consented that such work might be done. Wood had not paid the $15,000 in cash, and had not received his deed; and Mrs. Paddock, through Lanning and through Mr. Abbott, whom she afterwards married, was making strenuous efforts to get Wood to make such payment; but the payment never was made, and Wood was finally ejected from the property some time in the month of August. The plaintiffs, who did the work upon the property, were only partially paid by Wood for the work done and materials furnished by them, and thereupon filed the mechanics' liens which this action is brought to foreclose.

The experienced and competent referee before whom the action was tried appears to have very carefully and thoroughly considered all the questions of law and fact involved in the case, and we think that his decision was correct. In the elaborate opinion written by him he reviews all the decisions which throw any light upon the construction which should be given to the word "consent," as used in the mechanic's lien law of 1885, and adopts the view most favorable to the plaintiffs, holding that it was not necessary for the plaintiffs to prove the express consent of the defendant Mrs. Paddock, but that such consent might be inferred if, having knowledge that such improvements were being made upon her land, she remained silent or acquiesced. An examination of the evidence has also satisfied us that he was correct in his conclusion that the plaintiffs did not prove either an actual consent of the defendant Mrs. Paddock to the making of such improvements upon her land, or such knowledge thereof, followed by silence or acquiescence on her part, as to warrant the inference of such consent. The referee in his opinion examined the material testimony at length, and, as we concur in the result

reached by him, it would subserve no useful purpose for us to go over the same ground, and discuss the evidence in detail, as we could only repeat the reasons given by him for his conclusion. The judgment should be affirmed, with costs. All concur.