**WESTERN CONTRACTING CORPORATION, a corporation, Plaintiff,**

v.

**SOONER CONSTRUCTION COMPANY, a corporation, Defendant.**

**Civ. No. 65–72.**

United States District Court
W. D. Oklahoma.
June 30, 1966.

Kindig, Beebe, McCluhan & Rawlings, Sioux City, Iowa, Fowler, Rucks, Baker, Jopling, Gramlich & Mee, Oklahoma City, Okl., for plaintiff.

Stagner, Alpern, & Powers, Oklahoma City, Okl., for defendant.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

This is an action by the plaintiff, Western Contracting Corporation, against the defendant, Sooner Construction Company, for breach of an alleged subcontract between the parties on a runway project

at Tinker Air Force Base, Oklahoma. There was no written subcontract signed by the parties. The plaintiff relies upon an implied contract and estoppel. The defendant asserts that there was no meeting of the minds of the parties on the subcontract, thus, no subcontract, express or implied, and no estoppel. The defendant seeks recovery for a small open account item it furnished the plaintiff.

From the evidence the Court finds that Sooner orally quoted certain unit prices on asphalt paving to Western prior to Western submitting its bid on the project for the prime contract. Western was successful on its bid. Thereafter, Sooner confirmed its orally quoted prices to Western by a letter dated March 25, 1963.[1] The oral quotes and the letter quotes were the same. Regarding the item of hot mix surface the price quote of Sooner was 17,220 tons at $8.32 per ton less a 50¢ per ton discount if payment is made by the 10th of the month. Sooner asked for the subcontract during these activities but the request was denied. During the period from March 25, 1963, the date of the above mentioned letter, until July 15, 1963, Western opened an office at Tinker and the parties had various contacts, telephone calls, and discussions regarding the possibility of a subcontract. Western was obtaining asphalt quotes elsewhere. On July 15, 1963, at Tinker a meeting was had attended by a Mr. Hastie for Western, a Mr. Lemon for Sooner, a Mr. Pybas, a superintendent of Sooner, and a representative or representatives of the United States Corps of Engineers. At the meeting discussions were had regarding the specifications, equipment and rolling stock. Hastie testified that after this meeting he for Western and Lemon for Sooner reached an oral agreement on the

---

1.

Received after Bidding

Haskell Lemon Construction Co.
Road Building and Paving

Phone WIndsor 6-3357     P. O. Box 7118
OKLAHOMA CITY, OKLAHOMA

March 25, 1963     Western Contracting Corp.
Sioux City, Iowa
RECEIVED
Mar 28 1963

Western Contracting Corporation
400 Benson Building
Sioux City, Iowa
Gentlemen:
Congratulations on receiving the Tinker Field contract. I hope that it will prove to be a most successful job for you.
We would like very much to make a contract with you to do your asphalt paving work on this job. This letter is to confirm the prices which we quoted you at Fort Worth.

Item 9.   Prime 48,150 gallons @ .19 Furnish, deliver and apply..no brooming or blotting.
Item 10.  Tack coat, 260 gal. @ .37
Item 11.  Tack coat, 318 gal. @ .37
Item 13.  Hot mix surface 17,220 T. @ $8.32, less 50¢ ton discount for payment by 10th of month
Item 14.  Asphalt (85–100) 215,350 gal. @ .13
No quotation on item 12, 15, 16, 17 as they may be deleted.

We will be happy to help you in any way possible on this contract. We would appreciate your contacting us when you establish your job office here. We hope the job will prove to be both pleasant and profitable and that we will have the opportunity of working with you.

Yours very truly,
/s/  Haskell Lemon

Haskell Lemon
Haskell Lemon Construction Co.

subcontract following which a form of subcontract, unsigned by Western, was forwarded by Hastie to Sooner for execution and return to Western for execution by Western at its home office in Iowa. On the hot mix surface this written subcontract submitted by Hastie contained a price of $7.82 per ton thereon but did not provide for payment by the 10th of the month. Rather, it provided for partial payments to Sooner, less a retained percentage of 10%, as Western was paid on estimates by the owner and final payment to Sooner upon complete performance of the subcontract within 45 days after final payment is received from the owner by Western. Lemon denied that an oral subcontract was agreed upon on July 15, 1963, with Hastie and denied that any discussions were even had whereby Sooner would agree to the $7.82 price with the retainage provision and final payment provision as above set out instead of payment for the hot mix surface by the 10th of the month. Pybas, who testified that he was with Lemon at all times going to, at and from the Tinker meeting on July 15, 1963, also denied any oral agreement on the subcontract or any discussions about the discounted price of $7.82 being agreeable without payment by the 10th of the month. Lemon testified that shortly after receiving the written subcontract from Hastie he called Hastie on the phone several times and objected to the lower price of $7.82 per ton without payment being provided for by the 10th of the month in accordance with his quoted terms. Hastie acknowledged several telephone conversations after July 15, 1963, with Lemon regarding the retainage and that Hastie suggested in one of these conversations a reduction of the retainage to only 50% of the work. Hastie further testified that Lemon never gave him an answer to this suggestion.[2]

Western points to several actions of Sooner after the July 15, 1963, meeting which it says supports the claimed oral subcontract and that they evidence an implied subcontract and create an estop-

2. This is the testimony of Hastie on these points:

"Q After you submitted Plaintiff's Exhibit A to Mr. Lemon, you say on July 18th, did you then have any further discussion with him?

A Yes, he called me on the phone on several occasions and we discussed certain of the terms of this submitted subcontract.

Q And what terms did you discuss, if you remember?

A One of them was the retainage; he wanted the retainage reduced. The original retainage was ten percent in the total amount of the contract, and we agreed verbally to reduce that to ten percent of the first fifty percent of the contract.

Q To ten percent of the first fifty percent?

A Yes, and thereafter no further retainage.

Q And you did agree that Plaintiff's Exhibit A could be amended to that extent?

A Yes, we did.

Q And did you have any other conversation with him about any of the other terms?

A Another one of the terms that he wanted changed was that we would add a clause that he would not be responsible for keeping up with our schedule in the event of strikes, fire, flood, or things beyond his control.

Q And did you agree to that?

A Yes, we did.

Q Were there any other items that he discussed with you?

A Another one was that he wanted us at the end of each phase of the work—you understand there were three phases in this work.

Q What were the phases?

A We called them Phase One, Phase Two, and Phase Three.

Q What were they?

A They were portions of the asphalt shouldering on one of the taxiways. Phase One took a certain amount; Phase Two some more; then Phase Three the balance. And he wanted us to pay him in full for each phase of the work within forty-five days of its completion.

Q Did you agree to that?

A What I told him we could do would be if the Corps of Engineers would agree to pay us in full for each phase as it was completed, then we would pay him in full.

Q And did he agree to that?

A I don't recall he ever gave any answer to that."

pel which prevents Sooner from now denying the claimed oral subcontract of July 15, 1963. These actions of Sooner consisted of Sooner furnishing a certificate of insurance to Western, names of personnel and vehicles to secure passes and decals, working with their personnel and the Corps of Engineers on a mix to meet the specifications, asking for and getting a modification from the owner on the scale requirement and furnishing to Western a small quantity of asphalt mix.

Sooner does not deny these activities but asserts that they were of little consequence and except for furnishing the hot mix were only normal preparations in anticipation of eventually getting the subcontract which was under negotiation. As to the hot mix, Sooner asserts that this was a small quantity ordered by Western for their own work and not work under the subcontract and which was furnished as requested by Western in the interest of good relations and the anticipated subcontract. Sooner did not furnish a payment and performance bond, move onto the job or do any work called for by the subcontract.

It does appear from the evidence that Sooner was having some trouble with getting the Corps of Engineers to approve their mix under the specifications and the problem here apparently was never finally resolved between them before negotiations terminated between Sooner and Western.

In late September, 1963, certain developments took place. Sooner sent a signed subcontract to Western to which it attached certain amendments, six in number, one of which called for full payment for each of the three phases of the work to be done by Sooner within 45 days of completion by Sooner of each phase in lieu of Sooner's requirement in its written confirmation of payment by the 10th of the month and Western's requirement in the written subcontract it prepared and submitted of the 10% retainage and the final payment in 45 days. Western wrote Sooner a letter advising Sooner that it was delinquent in the performance of its subcontract and that if Sooner did not correct this default in performance within five days Western would exercise its rights under the subcontract. Then on September 29 or 30, 1963, a meeting was held in Oklahoma City which brought a Mr. Shaller down from Iowa for Western. Shaller as manager of heavy construction for Western was over Hastie. At this meeting the six amendments were discussed one by one and Shaller disapproved the amendment about full payment in 45 days following each phase completion as well as two other amendments and in his own hand wrote "out" opposite each of the three amendments so disapproved. Shaller approved the other three amendments. In the language of Shaller, finally at this meeting "things were terminated". Under date of October 2, 1963, Western made a subcontract with Metropolitan Paving Company for larger unit prices as to all items (the price for hot mix surface—the largest item—was $8.53 per ton) and sues herein for the difference amounting to $16,957.08 plus interest, overhead and profit and other expenses.

■ An implied contract is one deemed to have been reached by the parties even though not expressed by a document or documents, because of subsequent conduct and actions regarding the subject matter involved. In Board of County Com'rs of Seminole County v. Southwest Natural Gas Co., 192 Okl. 594, 138 P.2d 525 (1943), it has been held:

"* * * '[A]n implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a natural intent to contract. It has been said that such a contract must contain all the elements of an express contract, it rests on consent, it is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Such a con-

tract does not arise out of an implied legal duty or obligation but out of facts from which consent may be inferred.' * * *.

" 'As the law will not imply a promise, where there was an express promise, so the law will not imply a promise of any person against his own expressed declaration, because such declaration is repugnant to any implication of a promise.' "

15 Oklahoma Statutes, Section 71 provides:

"An acceptance must be absolute and unqualified, or must include in itself an acceptance of that character, which the proposer can separate from the rest, and which will include the person accepting. A qualified acceptance is a new proposal."

Anderson v. Garrison, Okl., 402 P.2d 873 (1965) provides:

"In order that a counter-offer and acceptance thereof may result in a binding contract, the acceptance must be absolute, unconditional, and identical with the terms of the counter-offer."

Also, Nabob Oil Co. v. Bay State Oil & Gas Co., 208 Okl. 296, 255 P.2d 513 (1953).

■ It is true that the parties may have a binding agreement, provided they have reached one, even though they have the understanding that the agreement should be formally drawn up. This depends upon the intention of the parties.

Fry v. Foster, 179 Okl. 398, 65 P.2d 1224 (1937) holds:

"Where parties to an agreement make its reduction to writing and signing a condition precedent to its completion, it will not be a contract until this is done, and this is true although all the terms of the contract have been agreed upon. But, where parties have assented to all the terms of the contract, and they are fully understood in the same way by each of them, the mere reference in conjunction therewith to a future con-

tract in writing will not negative the existence of a present contract."

■ The doctrine of estoppel is applied to promote justice and fair dealing and when by words or conduct of one party another party has been induced to rely upon the same to his injury.

L. C. Jones Trucking Company v. Cargill, Okl., 282 P.2d 753 (1955) holds:

" 'A person relying on an estoppel must have exercised such reasonable diligence as the circumstances of the case require, and if he conducts himself with a careless indifference to the means of information reasonably at hand or ignores highly suspicious circumstances, which should warn him of danger or loss, he cannot invoke the doctrine of estoppel.

'No estoppel arises where the party setting it up is under as great obligation to inform the person sought to be estopped of the real facts as the latter is to inform himself. There can be no estoppel where the truth is known to both parties, or where they both have equal means of knowledge.' "

■ The essential elements of such estoppel are:

1. An act or failure to act.
2. Intent that the act or failure to act will be relied upon but there must be reasonable grounds to believe that such action or failure to act is calculated to induce reliance.
3. Justifiable reliance requiring that the party claiming the estoppel shall have acted in good faith, relying on the estoppel and in the belief of its truth, and,
4. Prejudice resulting from the act or failure to act complained of herein.

■ But a contract may not be formed or created by estoppel. 31 C.J.S. Estoppel § 151, p. 742. Rather, the contract is deemed to have been made and its existence cannot be denied because of the conduct and actions of the party to be estopped.

■ Thus, the importance of what actually took place on July 15, 1963, be-

tween Hastie and Lemon—whether they reached an oral agreement or not—becomes apparent. Hastie says they reached an oral agreement. Lemon and Pybas say they did not. Hastie does not claim that the alleged oral agreement was reached in the presence of the representatives of the Corps of Engineers who attended the meeting, therefore, these representatives are not able to give any assistance to the problem. The Court is of the opinion and finds and concludes that Hastie and Lemon did not on July 15, 1963, reach an oral agreement on the subcontract or discuss and settle the price differential on the hot mix surface with reference to the two alternative prices quoted by Sooner and the effect of the method of payment on the same. It is believed that when Western prepared the subcontract shortly after July 15, 1963, it sought to take advantage of the lower quoted price without meeting the condition attached to the same regarding payment. To this Sooner promptly objected and Sooner did not sign and return the subcontract as requested by Western. Hastie admits that several telephone conversations immediately followed his mailing the subcontract he prepared, these telephone conversations coming from Lemon and that the subject matter of the calls had to do with the retainage provision of the submitted subcontract as it affected the price of the hot mix surface. Western places much reliance upon the other conduct of Sooner and the passage of time before Sooner submitted its subcontract with the amendments attached but Western overlooks the above mentioned conduct of Sooner which took place immediately following the submission of the first subcontract and was in the form of objections to the retainage and final payment provisions and the use of the lower quoted price without payment by the 10th of the month as provided in the written quote by Sooner. Such other conduct of Sooner is not of great significance. The furnishing of an insurance certificate, names for badges and decals, and getting a change in the scale requirement are administrative details which could normally be undertaken in anticipation of eventually reaching agreement on the subcontract and due to the imminence of the commencement of the paving work on the project. If no agreement should eventually be reached on the subcontract, little would be lost by Sooner by these actions. Working with the Corps of Engineers on the mix is of greater consequence, perhaps, but again this could normally be expected to be done in anticipation of reaching an agreement on the subcontract and getting the job. While Western attributes the difficulty with the mix as the real reason why Sooner did not sign and return the written subcontract submitted it is the evidence that these difficulties were not encountered until after the telephone calls were made objecting to the payment provisions of the subcontract submitted and after the period of time that the subcontract would normally have been signed and returned if not objectionable. Also from the evidence it appears that this difficulty would have been reconciled to the satisfaction of Sooner and the Corps of Engineers since Metropolitan Paving Company did the job in the manner and method proposed by Sooner. And the furnishing of a very small amount of mix needed by Western for some of their work is only good relations and certainly not of enough consequence to seal a $170,000.00 bargain between the parties.

The Court, therefore, finds and concludes from the evidence that Sooner quoted a price of $7.82 a ton on hot mix surface provided payment was received for the same by the 10th of the month—otherwise the price would be $8.32 a ton; that the weight of the evidence indicates that this alternative quote and payment condition of Sooner was not changed or discussed on July 15, 1963; that Western in submitting a subcontract to Sooner set out the $7.82 per ton price but did not meet the payment condition attached to the same; that Sooner immediately and admittedly by several telephone conversations objected to this feature of the subcontract as submitted; that Sooner after the July 15, 1963 meeting and after

the subcontract of Western was submitted did certain things all of which were done in anticipation of eventually reaching an agreement on the subcontract and these activities were of a nature which normally could be done by one negotiating for a subcontract and in reasonable anticipation of getting the same; that while a period of several weeks lapsed before Sooner submitted its subcontract with amendments such lapse of time transpired in the face of and after objections were made by Sooner to the subcontract submitted by Western and particularly with reference to the use of the lower quoted price on hot mix surface without complying with the requested method of payment in the use of such price; that at the meeting on September 30, 1963, Western would not agree to the originally quoted alternative price of Sooner or its modification as later proposed by Sooner and terminated the matter; that while Sooner was having some difficulties with the Corps of Engineers on the mix Western terminated the matter before this difficulty was finally resolved. The Court, therefore, fails to find from the evidence an express subcontract, a subcontract implied from the actions and conduct of the parties or that Sooner by its conduct is estopped to deny that it had a subcontract with Western as of July 15, 1963. The Court is of the opinion that the parties never reached a meeting of the minds on the price and method of payment for the hot mix surface, the principle item involved. Young v. Roller, 201 Okl. 99, 201 P.2d 793; Nabob Oil Co. v. Bay State Oil & Gas Co., 208 Okl. 296, 255 P.2d 513; Anderson v. Garrison, Okl., 402 P.2d 873. In simple summary, Sooner quoted an alternative price on hot mix surface to Western, Western submitted a subcontract containing a price and method of payment different from each alternative, Sooner submitted an amended contract with still a different price and method of payment, this was not acceptable to Western and the matter was terminated by Western.

Plaintiff is, therefore, not entitled to the judgment it seeks. To the contrary, the defendant is entitled to judgment against the plaintiff for the mix it furnished the plaintiff for its work for which the defendant has never been paid.

Counsel for the defendant will prepare a judgment in conformity with the foregoing and submit the same to the Court pursuant to Rule 58, F.R.Civ.P., and Rule 22 of this Court.