**Joseph P. LONDRIGAN, Appellant**

v.

**FEDERAL BUREAU OF INVESTIGATION.**

**No. 79–1403.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1980.

Decided Dec. 31, 1981.

William A. Dobrovir, Washington, D. C., with whom Joseph D. Gebhardt, Washington, D. C., was on the brief, for appellant.

Mark N. Mutterperl, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, and MacKINNON and MIKVA, Circuit Judges.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

Dissenting Opinion filed by Circuit Judge MacKINNON.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

The controversy in this case centers on the efforts of the appellant, Joseph P. Londrigan, to uncover the identities of persons who furnished information about him to the appellee, the Federal Bureau of Investigation, during the course of an investigation of his qualifications for federal employment. Presented for decision is a question going to the very heart of the Privacy Act

of 1974:[1] What must an agency demonstrate in order to withhold information pursuant to Exemption (k)(5) on grounds that it was obtained under an implied promise of confidentiality?[2] Implicitly concluding that invocation of Exemption (k)(5) by an agency requires only a minimal showing, the District Court granted summary judgment in favor of the FBI. On the basis of our interpretation of Exemption (k)(5), we find that the record before the court was insufficient to support a summary disposition. We further find that the court ruled incorrectly on two Rule 56[3] motions made by Londrigan in an attempt to fortify his opposition to an award of summary judgment. Accordingly, we reverse the District Court's rulings and remand the case for further proceedings.

## I. Background

The data specifically sought by Londrigan are the names of persons who provided the FBI with information about him in 1961, long before the advent of the Privacy Act, when he was under investigation for a position as a Peace Corps volunteer. The FBI's file includes statements from private individuals as well as from employees of schools, businesses, and state and local governmental agencies.

Londrigan initiated his endeavor to obtain his FBI file in October, 1975, when he wrote to his congressman to ask for assistance in acquiring it. His letter was forwarded to the FBI, and in March, 1976, he received copies of the materials on file, albeit with substantial deletions made assertedly under authority of Exemption (k)(5) of the Privacy Act.[4] Dissatisfied with the redacted documents, Londrigan appealed the agency's decision to withhold the deleted portions to the Deputy Attorney General. His appeal proved unsuccessful, and in July, 1978, he brought suit in the District Court.

Shortly after answering Londrigan's complaint, the FBI submitted a motion for summary judgment supported only by an affidavit prepared by Special Agent Charles J. Wroblewski, then a supervisor of the FBI's Freedom of Information-Privacy Act Branch.[5] Wroblewski averred that the statements therein were "based upon [his] knowledge, upon information available to [him] in [his] official capacity, and upon decisions reached in accordance therewith."[6] The crux of Wroblewski's affidavit was his view that

> [p]ersons interviewed often assume, quite logically, that the information they furnish is only for the official use of the FBI in the fulfillment of its responsibilities, and that, the identities and the fact of their cooperation with the FBI will not be publicly exposed. Without that implied confidentiality, the fear of such exposure would inhibit the cooperation of otherwise conscientious citizens.[7]

Wroblewski did not participate in the Londrigan investigation himself, and apparently made no effort to contact any of the agents who had conducted the recorded interviews.[8] What he tells us is that

> [i]n conducting the background investigation regarding [Londrigan's] application for the position of Peace Corps Volunteer, the following groupings of individuals were considered to be implied confidential sources: school personnel, personal references, neighborhood and social ac-

1. 5 U.S.C. § 552a (1976).

2. *Id*, § 552a(k)(5), quoted in text *infra* at note 29.

3. Fed.R.Civ.P. 56.

4. 5 U.S.C. § 552a(k)(5) (1976), quoted in text *infra* at note 29.

5. *Londrigan v. Federal Bureau of Investigation*, Civ.No. 78–1360 (D.D.C.), Defendant's Motion for Summary Judgment, Affidavit of Charles J. Wroblewski, at 1, Appendix (App.) 10 [hereinafter cited as Wroblewski Affidavit].

6. *Id.*

7. *Id.* at 5, App. 14.

8. *Londrigan v. Federal Bureau of Investigation*, *supra* note 5, Defendant's Answers to Plaintiff's Interrogatories (Interrogatory No. 9) at 6, App. 85 [hereinafter cited as Answers to Interrogatories].

quaintances, business associates, and former employees.[9]

In short, as the FBI admits, the Wroblewski affidavit reduces to the proposition that "any [background] investigation conducted prior to the effective date of the Privacy Act must be regarded as having been conducted under an implied promise of confidentiality."[10]

In response to the FBI's summary-judgment motion, Londrigan moved to strike the Wroblewski affidavit pursuant to Rule 56(e) of the Federal Rules of Civil Procedure[11] on grounds that it was not based upon personal knowledge. He also filed a motion pursuant to Rule 56(f)[12] requesting a continuance in order to take the depositions of the agents who had actually prepared the contested documents.[13] The District Court denied the motion to strike and refused to allow Londrigan to depose the agents who had participated in the investigation.[14] The court did permit Londrigan to submit written interrogatories to the FBI.[15]

Londrigan's interrogatories attempted to unearth the basis of the statements contained in the Wroblewski affidavit. In responding on behalf of the FBI, Wroblewski made several statements of particular relevance to the matter before us. For example, in addressing "what percentage of persons interviewed . . . assume [that their identities will be kept confidential],"[16] Wroblewski replied that "[i]n 1961, when

this investigation was conducted, 100% of the persons interviewed assumed that their identities and the fact of their cooperation with the FBI would not be publicly exposed."[17] As the bases for these conclusions Wroblewski designated his review of documents pertaining to the investigation, prior experience, and FBI policy,[18] and attempted to buttress his assertions by noting that "[a]t the time these interviews were conducted in 1961, no such law as the Privacy Act was envisioned. There was no expectation that the identity of anyone who furnished information to the FBI would be divulged."[19] Finally, and somewhat inconsistently given his claims that interviewees automatically assumed that their comments would be kept secret, Wroblewski noted that one of the Londrigan sources had "expressly requested confidentiality" since a notation to this effect was contained in the file.[20]

Despite these revelations of the tenuous nature of the affidavit's predicates, the District Court granted the Government's motion for summary judgment.[21] In so doing, the court stated that its decision was based on the entire record before it, but emphasized that

an examination of the documents at issue, particularly noting the types of individuals interviewed, such as school personnel, personal references, neighborhood and social acquaintances, and business as-

---

**9.** Wroblewski Affidavit, *supra* note 5, at 5, App. 14.

**10.** Brief for Appellee at 6.

**11.** Fed.R.Civ.P. 56(e).

**12.** *Id.* 56(f).

**13.** *Londrigan v. Federal Bureau of Investigation, supra* note 5, Plaintiff's Motion to Strike, App. 74.

**14.** Apparently several of the agents who conducted the 1961 investigation were still employees of the FBI at the time Londrigan instituted his suit in District Court. See Answers to Interrogatories, *supra* note 7, (Answer to Interrogatory No. 9) at 8, App. 86.

**15.** *Londrigan v. Federal Bureau of Investigation,* No. 78–1360 (D.D.C.) (order denying Motion to Strike) (Nov. 14, 1978), App. 78.

**16.** Answers to Interrogatories, *supra* note 8, (Interrogatory No. 20) at 10, App. 89.

**17.** *Id.* (Answer to Interrogatory No. 20(a)) at 11, App. 90.

**18.** *Id.* (Answer to Interrogatory No. 20(c)).

**19.** *Id.* (Answer to Interrogatory No. 23) at 12, App. 91.

**20.** *Id.* (Answers to Interrogatories Nos. 3 & 21) at 5, 11, App. 84, 90.

**21.** *Londrigan v. Federal Bureau of Investigation, supra* note 5, (order) (Jan. 30, 1979), App. 96.

sociates, and the substance of the questions asked such as inquiries about Plaintiff's character, reputation, loyalty, associates, and abilities, and further noting that the interviews were conducted by agents of the Federal Bureau of Investigation in 1961, reveal[ed] sufficient circumstances indicating the existence of implied promises of confidentiality. . . .[22] Londrigan appeals this decision, as well as the District Court's disposition of his Rule 56 motions.

## II. Exemption (k)(5) of the Privacy Act

The Privacy Act came into being in conjunction with 1974 legislation amending the Freedom of Information Act (FOIA).[23] It had its genesis in a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct. In response to fear that "the secret gathering of information on people or the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch"[24] could soon make Orwell's vision of 1984[25] a reality, Congress designed the Privacy Act "to prevent the kind of illegal, unwise, overbroad investigation and record surveillance of law-abiding citizens produced in recent years from actions of over-zealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies."[26]

In providing for divulgence of the contents of agency records to individuals to whom they pertain, the structure of the Privacy Act is similar to that of the Freedom of Information Act.[27] One of the Privacy Act's fundamental premises is that all records compiled on an individual must on request be revealed to that individual unless they fall within one or more specifically enumerated exemptions.[28] This litigation implicates Exemption (k)(5), which protects from disclosure.

> investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence.[29]

22. *Id.* at 1 (citation omitted).

23. 5 U.S.C. § 552 (1976).

24. S.Rep.No.1183, 93rd Cong., 2d Sess., 2 (1974) U.S.Code Cong. & Admin.News 1974, pp. 6916, 6917 [hereinafter cited as Senate Report].

25. See G. Orwell, *Nineteen Eighty-Four* (1949).

26. Senate Report, *supra* note 24, at 1, U.S.Code Cong. & Admin.News 1974, p. 6916.

27. 5 U.S.C. § 552 (1976).

28. Subsection 552a(d) of the Privacy Act affords general access by an individual to a federal agency record pertaining to him. 5 U.S.C. § 552a(d) (1976). This provision mandates disclosure, upon request by the individual, of all information contained in the agency record save that specifically exempted by subsections

552a(j) and 552a(k). *Id.* §§ 552a(j), (k). Another essential function of the Privacy Act is to prevent unauthorized disclosure of a record to a person or entity other than the individual upon whom it is maintained. See *Id.* § 552a (b). These two parts of the Act work hand-in-hand "to promote observance of valued principles of fairness and privacy." Senate Report, *supra* note 24, at 2, U.S.Code Cong. & Admin. News 1974, p. 6917. See generally, 1 K. Davis, Administrative Law Treatise § 5.43 (2d ed. 1978).

29. 5 U.S.C. § 552a(k)(5) (1976). The Act further provides that the exemptions, including (k)(5), become operative only upon promulgation of appropriate rules by the head of the agency seeking to invoke them. *Id.* § 552a(g). The FBI's compliance with this requirement is not questioned in this case. The applicable FBI regulation is set forth in 28 C.F.R. § 16.42(b)(3) (1980).

The statutory language most critical to the case at bar refers to an "implied promise that the identity of the source would be held in confidence." Its significance is a question of first impression for a court of appeals, and only one district court seems to have addressed it directly. In *Nemetz v. Department of Treasury*,[30] a case similar in many respects to the one now before us,[31] the court refused to award summary judgment for the agency, stating:

> We find that the defendant's general averments of promises of confidentiality are insufficient to support an award of summary judgment on their behalf. To fulfill the Privacy Act's purpose of granting access to an individual's government records, ... any exemptions must be narrowly construed and the requirements strictly met. In cases where exemption is sought under Section 552a(k)(5), this standard requires finding a promise of confidentiality as to each source sought to be withheld. General allegations concerning "policy" are insufficient. Evidence must be presented based on personal knowledge that an express or implied promise of confidentiality was given as to each source sought to be exempted under this provision.[32]

We think that this approach is eminently correct. To allow an agency to withhold information simply by asserting that all background investigations conducted prior or to the effective date of the Privacy Act must be deemed to have been undertaken under implied promises of confidentiality is to defeat the congressional intent underlying the design of the statute. In response to concern that agencies such as the FBI would be hampered in their law enforcement efforts by the Privacy Act's disclosure mandate, Congress specifically exempted information held by these entities *for law enforcement purposes.*[33] After weighing the competing interests in information gathered on prospective federal employees, however, Congress struck an entirely different balance. In this area, Congress plainly determined that the Government's stake in nondisclosure was far less important than it is in the context of law enforcement operations,[34] and it is evident that the citizen's interest in access to personal data affecting his ability to earn a living is of a very high magnitude. Consequently, Congress authorized withholding of identities of sources of such information, when gathered after the effective date of the Privacy Act, only upon a showing of an express promise of confidentiality.[35] Identities of persons who supplied information on prospective federal employees prior to that time were to be accorded somewhat greater protection, but certainly not an absolute exemption from disclosure. On the contrary, their identities were to be shielded only upon demonstration of an implied promise of confidentiality.[36]

**30.** 446 F.Supp. 102 (N.D.Ill.1978).

**31.** In *Nemetz*, the plaintiff sought access to background information obtained by the Secret Service in the course of an investigation conducted pursuant to his application for employment. He also sought to amend any inaccuracies or incomplete portions of the documents he had requested. *Id.* at 104.

**32.** *Id.* at 105 (footnote omitted).

**33.** See 5 U.S.C. § 552a(j)(2) (1976).

**34.** Exemption (k)(5) of the Privacy Act must be carefully distinguished from Exemption 7 of FOIA, 5 U.S.C. § 552(b)(7) (1976), which permits agency retention of "investigatory records compiled for law enforcement purposes." *Id.* The FBI has attempted to justify its refusal to release the identities sought by Londrigan on the basis of cases construing Exemption 7 of FOIA. Since that exemption, like Exemption (j)(2) of the Privacy Act, *Id.* § 552a(j)(2), applies only to records held for law enforcement purposes, these cases are inapposite. We are aware of a reference to Exemption 7 of FOIA during the debate on Exemption (k)(5), see 120 Cong.Rec. 36655 (1974) (remarks of Representative Erlenborn), but it does not alter this conclusion. Although Representative Erlenborn cited Exemption 7 as an example of the recognized need for confidentiality in some situations, a later colloquy between Representative Erlenborn and Representatives Goldwater and Fascell explicitly defines the limits of Exemption (k)(5). See text *infra* at notes 39–43.

**35.** See text *supra* at note 29.

**36.** See text *supra* at note 29.

The Wroblewski affidavit does not suffice to establish that the Londrigan interviewees were all, or indeed in any particular instance, impliedly assured of confidentiality. Wroblewski reveals nothing unique, in terms of need or desire for confidentiality, about this group of persons or their comments; rather, he asks the courts to do what Congress has already refused to do—except all pre-1975 investigative files from disclosure. To do so would put this court in a legislative rather than a judicial role, a transposition of functions we cannot accept. By the same token, an examination of documents which reveals merely that they contain information about a prospective employee's character, ability and other traits, and that these data were supplied by acquaintances, business associates, and record custodians, does not furnish enough of a foundation for upholding an agency's refusal to disclose the identities of the sources. Nor is the fact that the FBI collected the materials dispositive. These are elements common to nearly every file maintained on candidates for federal employment, and factors of which Congress was well aware.[37]

---

**37.** These considerations bare another infirmity in the District Court's ruling. The case was terminated by entry of a summary judgment, a procedure which is authorized only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The crucial issue posed by the FBI's invocation of Exemption (k)(5) was whether, in the instance of each supplier, the FBI obtained information later withheld through an implied promise of confidentiality. The question obviously was one of fact: whether the circumstances surrounding acquisition of the information warranted implication of such a promise.

In the District Court's words, the problem confronting it was "whether, with regard to the investigatory material concerning [Londrigan], implied promises that the identity of the sources who furnished such information to the Government would be held in confidence may be found by the Court to have been made...." Londrigan v. FBI, supra note 5, Order (filed Jan. 30, 1979) at 1, App. 96. The court then, upon "an examination of the documents at issue" and "particularly noting the types of individuals interviewed," "the substance of the questions asked" and the fact "that the interviews were conducted by agents of the [FBI] in 1961," concluded that they "reveal[ed] sufficient circumstances indicating the existence of implied promises of confidentiality...." Id., App. 96 (citation omitted). In so doing, the court exceeded the limits circumscribing the use of summary judgment.

To be sure, any number of circumstances may combine to convince a trier of fact, as a matter of logical inference, that particular information was procured in a particular situation by a particular inquirer from a particular supplier only in consequence of an assumed though unarticulated assurance of confidentiality. Here, however, the District Court did not have the role of factfinder when it acted, nor were the circumstances enumerated by the court so compelling as to render such an inference inevitable on all occasions. The vagaries of human nature being what they are, the most that can be said is that some people would, but others would not, presuppose that the interviewee's identity would remain enshrouded in secrecy. A conclusion that a supplier made that assumption can follow in any given instance only by force of inference from its own set of circumstances.

Recounting well-settled principles governing resort to the summary judgment procedure, we admonished very recently that

[t]he court's function is not to try disputed issues of fact, but only to ascertain whether such an issue is present, and any doubt on that score is to be resolved against the movant. Since it is he who bears the onus of establishing his entitlement to summary judgment, his opponent enjoys the benefit of all favorable inferences from the evidence proffered....

Abraham v. Graphic Arts Int'l Union, 212 U.S. App.D.C. 412, 415, 660 F.2d 811, 814 (1981) (footnotes omitted). It follows that "[s]ummary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts," United States v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970); and that "[e]valuative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment." Chenette v. Trustees of Iowa College, 431 F.2d 49, 53 (8th Cir. 1970). It is "[o]nly where the facts supportive of a summary judgment can be held to have so unambiguously established the actualities of a situation as to leave no basis of substance for dispute as to their reality or as to the conclusion required from them is a summary judgment entitled to be entered." Id. Accord, Sears, Roebuck and Co. v. GSA, 180 U.S. App.D.C. 202, 206, 553 F.2d 1378, 1382, cert. denied, 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977); Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co., 420 F.2d 1211, 1213 (5th Cir. 1969); S. J. Groves & Sons Co. v. Ohio Turnpike Comm'n, 315 F.2d 235, 237–238 (6th Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963). Here the circumstances relied upon by the District Court did not lead inexorably to implication of promises of confi-

To rest a holding that nondisclosure is justified solely on identification of these ingredients is to abdicate the responsibility vested in the courts to ensure that the Privacy Act is obeyed. If Congress had intended to require no more than a showing as minimal as that accepted by the District Court in this case, it could simply have enacted a blanket exemption for files containing information on a federal job-applicant's qualifications. Since Congress did not insert such an exception to disclosure in the Privacy Act, it surely must have expected a stronger demonstration of an implied promise of confidentiality than is portrayed by either the Wroblewski affidavit or the District Court's observations on the nature of the documents lodged in Londrigan's FBI file.

■ The legislative history of the Privacy Act provides clear support for the conclusion that neither a conclusory affidavit nor a general examination of documents suffices to validate a finding of an implied promise of confidentiality. While neither the House nor the Senate committee report is particularly helpful on this point, the debates are most informative. Exemption (k)(5) originated as an amendment to H. 16373, the House bill that later became the Privacy Act.[38] The amendment was introduced by Representative Erlenborn in order to protect the identities of persons who without an expectation of confidentiality would not have supplied information to the agency collecting it. According to Representative Erlenborn,

> [i]n the past there has been lawfully expressed an implied promise of confidentiality given to those who have made statements to investigators.
>
> The functions of this bill, if it is not amended by the Erlenborn amendment, will be to open up all of those old files so that those statements that were given in confidence will now be made available to the individual.[39]

The introduction of this proposed addition to the bill sparked a somewhat heated discussion. Objections were raised on the theory that it would insulate from disclosure far too much of the information contained in files theretofore compiled prior.[40] Representative Fascell questioned even the notion of an implied promise of confidentiality; he related, "never have I had any Government agency or agent say to me, '[s]ir, the information you give me is classified' or '[t]he information will be kept confidential.' "[41] In response, Representative Erlenborn was at pains to point out that the exemption was intended to be very narrow:

dentiality—either wholesale, or on any particular occasion—and the court erred when it engaged in fact finding in the context of summary judgment.

**38.** The House debated H.R. 16373 on November 20, 1974, at which time it adopted the amendment. 120 Cong.Rec. 36658 (1974). The following day it enacted the measure as a whole. *Id.* at 36976. On December 11, the House also passed the Senate version of the bill, with an amendment substituting its own language for that of the Senate in its entirety. *Id.* at 39204. It was this substitute to which jointly agreed-upon amendments were made to produce the final legislation. *Id.* at 40400 (remarks of Senator Ervin), 40410–40411 (remarks of Senator Hruska).

**39.** *Id.* at 36657 (remarks of Representative Erlenborn).

**40.** See, *e.g., id.* (remarks of Representatives Abzug, Fascell and Goldwater).

The emphasis placed on maximal disclosure by both the House and the Senate is highlighted by the treatment of an aspect of Exemption (k)(5) not before us in this case. The debates in both Houses considered the related question whether an individual already employed by the Government, but denied promotion allegedly on the basis of confidential derogatory information, could be denied access to that information in the context of a legal proceeding on the ground that confidentiality of the source would be breached. Both chambers placed in the record a staff report which concluded that the Erlenborn amendment in no way precluded access under those circumstances. *Id.* 40406 (Senate version), 40881 (House version with some variations in language). In the House, an exchange between Representatives Alexander and Erlenborn made clear that, if the information were essential to the case, the Government would have to disclose the source or lose. *Id.* at 40884–40885.

**41.** *Id.* at 36657 (remarks of Representative Fascell); see note 44 *infra*.

The gentleman from Florida says that he has never had any promises, express or implied. In that case, his name will be made available if he is not one who has given such a statement, because the only thing that would be protected are those confidential sources.[42]

Representative Erlenborn also indicated, in answer to a question from Representative Goldwater, that access to the courts would provide the necessary "check and balance" on agency discretion with respect to the "determin[ation] whether in fact information is included, or whether in fact third parties should be made available."[43]

■■ The import of this excerpt from the legislative history is plain, and it is precisely in line with our own conclusions and those of the *Nemetz* court.[44] Confidentiality is not to be inferred simply from the circumstance that the information was solicited by and given to a governmental agency; an adequate basis for implication of a promise of confidentiality must be shown. Something more is necessary than a general averment that all information compiled by the agency prior to 1975 was acquired pursuant to implied pledges of that sort. Verification of the fact of such a promise may vary in extent depending on the type of information, the circumstances under which it was gathered, and other factors, but some effort beyond mere observations that the documents contain comments on a prospective employee's character and other personal assets or shortcomings, and that they were supplied by acquaintances and business associates, must be made to enable a determination of exactly what kinds of assurances, if any, were given to providers of the information. An implied promise of confidentiality is established only as a logical deduction from the circumstances shown, and from one set to another the result indicated expectably may differ. In the instant case, for example, Wroblewski observed that one document notes an express request that the data therein be kept confidential, and clearly the identity of that source should not be disclosed.[45] The fact that the request was recorded, however, cuts against the agent's assertion that people naturally and invariably assumed that information they furnished the FBI would be held in secrecy. Similarly, while the supplier's relationship to the subject of the investigation may have significance for the outcome, the mere fact that he is a public or school official would not in itself seem to require withholding of his name, much less his position at the time the information was obtained.

■ It follows that this case must be remanded to the District Court for further investigation of the facts and circumstances surrounding the acquisition of the information contained in the FBI's file on Londrigan. In order to facilitate this process, there are several steps that the District Court appropriately may take. First, a careful review of each document should be undertaken to determine the nature of the source—for example, record custodian, personal acquaintance or the like—and whether any statement contained in the document

---

**42.** *Id.* (remarks of Representative Erlenborn).

**43.** *Id.* (colloquy between Representative Goldwater and Representative Erlenborn).

**44.** See text *supra* at note 32. We realize that, literally read, Representative Fascell's statement was that he had never received an *express* promise of confidentiality on any occasion when he supplied the information. The point, however, is that Representative Erlenborn interpreted it differently: "The gentleman from Florida says that he has never had any promises, express *or implied.*" 120 Cong.Rec. 36657 (1974) (emphasis supplied). Representative Erlenborn obviously understood Representative Fascell to mean that in no instance had he

detected any assurance of confidentiality. Accordingly, Representative Erlenborn replied, "in that case, his name will be made available . . . because the only thing that would be protected are those confidential sources." *Id.*

**45.** That conclusion in this instance is undoubted. We do not imply that the proof need always be so positive. Indeed, this notation on one of the documents in Londrigan's file appears to be an agent's record that an express promise of confidentiality was made to the provider of the information contained therein. See text *supra* at note 20.

indicates an expectation of confidentiality.[46] Second, while the FBI cannot realistically be expected to contact the interviewees themselves, at least some of the available investigating agents might be consulted to determine whether any promises or assurances were expressly given or impliedly arose in Londrigan's instance.[47] Third, FBI policies prevalent in 1961 may be considered, but great care should be taken to avoid confusion of internal agency rules with specific practices actually pursued with persons interviewed.[48]

The District Court may find other indicia of the presence or absence of promises of confidentiality, and the court should feel free to weigh them, but we hasten to point out that the mere fact that the FBI conducted the investigation or that the comments were of a personal nature does not dictate the result.[49] With that, we now turn to the District Court's dispositions of Londrigan's Rule 56 motions, and the need for their reconsideration on remand.

### III. The Rule 56 Motions

#### A. *Rule 56(e)*

■ A principal command of Rule 56(e) is straightforward: "Supporting and opposing affidavits" on summary-judgment motions "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[50] Although the rule's directive with respect to admissibility of an affidavit's contents on summary judgment has been liberally construed,[51] its requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented.[52] An affidavit based merely on information and belief is unacceptable.[53]

■ Irrefutably, the most critical part of the Wroblewski affidavit does not rise to the level Rule 56(e) demands.[54] Careful reading of this section of the affidavit reveals that a great deal of what it says could not possibly have been based on the affiant's personal knowledge of the documents in question or the details of the investigation that produced them. Wroblewski was competent to testify to his own observations upon review of the documents, including the fact that one of the sources whose identity was withheld by the FBI had specifically requested confidentiality; the procedural history of Londrigan's attempt to acquire information held by the FBI; the agency's procedures with respect to investigations during his own tenure therewith and earlier practices of which he possesses personal knowledge;[55] and his personal experiences as an agent to the extent that they bore relevance to the case. At this

---

**46.** For example, a specific request for confidentiality is reflected in one document. See text *supra* at note 20 & note 45 *supra*. We do not accept Londrigan's contention that only sources of derogatory information are protected from identification. Congress did not distinguish among types of information in drafting Exemption (k)(5). See 120 Cong.Rec. 36656 (1974) (remarks of Representative Erlenborn). Moreover, differentiation of derogatory and complimentary comments may sometimes be impossible; one may be complimented by comments from a stranger, yet insulted by the same remarks from a close friend. We do not believe the distinction is a sensible one.

**47.** We doubt that the FBI can satisfy its burden of establishing an implied promise of confidentiality without at least affidavits from these agents. Should the FBI elect not to obtain them, though, there is an even greater need for their depositions. See Part III *infra.*

**48.** In other words, some basis must be established that the interviewee was actually led to believe or expected that the information he provided would be kept confidential.

**49.** See note 46 *supra.*

**50.** Fed.R.Civ.P. 56(e).

**51.** See C. Wright & A. Miller, Federal Practice § 2738 (1973).

**52.** See J. Moore & J. Wicker, Federal Practice ¶ 56.22[1] (1980).

**53.** See *id.*

**54.** We refer to Part 15(B), which includes the second and third paragraphs on page 5 of the affidavit, App. 14, and the first paragraph on page 6, App. 15.

**55.** See text *supra* following note 47.

point, however, Wroblewski's competence terminated. He cannot possibly have personal knowledge of any assumptions made by persons interviewed by other FBI agents, and while he might be competent to testify to difficulties the FBI would encounter were promises of confidentiality not implied, that information is simply not pertinent to this litigation. As we noted earlier, Congress was aware of the negative aspects of releasing information in agency investigative files, but opted in favor of disclosure, subject only to narrowly defined limitations.[56] Moreover, the Privacy Act permits data collected after the effective date of the statute to be withheld only if an express promise of confidentiality was made;[57] thus, the situation Wroblewski alludes to no longer exists.

In sum, Wroblewski's affidavit undertook precisely the type of presentation Rule 56(e) prohibits. The District Court's refusal to grant Londrigan's motion to strike the Wroblewski affidavit must be rectified. On remand, the court must disregard the impugned part of the affidavit[58] in its entirety.

### B. *Rule 56(f)*

 As two well-known commentators have explained, "Rule 56(f)[59] protects a party opposing a summary judgment motion who for valid reasons cannot by affidavit—or presumably by any other means authorized under Rule 56(e)—present 'facts essential to justify his opposition' to the

motion."[60] Counsel for Londrigan complied with the prerequisites for invocation of Rule 56(f) by submitting an affidavit to the District Court explaining why he was unable to offer material in opposition to the FBI's summary judgment motion.[61] The District Court, by the terms of Rule 56(f), then had the options of refusing to grant summary judgment, ordering a continuance to permit affidavits to be secured or discovery to be conducted, or entering "such other order as was just."[62] Consonantly, the court chose to deny Londrigan's specific request to take depositions, but allowed him to submit written interrogatories to the FBI.

Unfortunately, however, the interrogatories did not fill the gaps in the Wroblewski affidavit. While the written interrogatories may indeed have been warranted, Londrigan additionally should have been permitted to procure such depositions as he could in order to obtain the insights of the agents who actually prepared the documents in dispute. Even if the District Court initially assumed that interrogatories would be sufficient, the answers to those interrogatories clearly demonstrated the need for testimony of agents personally involved in the investigation. Therefore, on remand, the District Court should allow Londrigan the opportunity to take those depositions should he renew his request.[63]

For the reasons we have set forth, the District Court's grant of summary judg-

---

**56.** See text *supra* at notes 33–36.

**57.** See text *supra* at note 32.

**58.** See note 54 *supra* and accompanying text.

**59.** "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Fed.R.Civ.P. 56(f).

**60.** C. Wright & A. Miller, *supra* note 51, at § 2740.

**61.** *Londrigan v. Federal Bureau of Investigation, supra* note 5, Affidavit of William A. Dobrovir, App. at 77.

**62.** See note 59 *supra*.

**63.** Discovery is especially important in cases, such as this, where a person requesting access to agency records under the Privacy Act or FOIA is entitled to as complete and accurate an explanation of the reasons for nondisclosure of sought-after information as the agency is able to provide. In this context, discovery benefits not only the requester but also the court, which must review an agency decision not to release. See, *e.g., Founding Church of Scientology v. National Security Agency,* 197 U.S.App.D.C. 305, 314 & n.75, 610 F.2d 824, 833 & n.75 (1979).

ment and its disposition of Londrigan's Rule 56 motions are reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MacKINNON, Circuit Judge (dissenting).

In 1978, Appellant, Joseph P. Londrigan, instituted this suit under the Privacy Act of 1974, 5 U.S.C. § 552a, seeking to compel Appellee, the Federal Bureau of Investigation (FBI), to disclose primarily the names of individuals who had given information to the FBI in a background investigation it had conducted of him in 1961. In response to Appellant's administrative request the FBI furnished him with all the requested information deleting only the data that would identify sources who, the FBI contends, furnished information under *implied promises* of confidentiality. On a record which included a comprehensive affidavit the District Court granted the FBI's motion for summary judgment finding that the record "reveals sufficient circumstances indicating the existence of implied promises of confidentiality." (App. 96) I would affirm this ruling.

## I. FBI Investigation

In August 1961, Appellant applied to the Peace Corps to be considered for the position of Peace Corps volunteer. (App. 34–35) As is standard government policy in such a case, the FBI ran the usual background investigation of Appellant to determine his suitability and qualification for the Peace Corps. The nature of the sources contacted by the FBI included school personnel, personal references, neighborhood and social acquaintances, and employment associates. The substance of the inquiries related to Appellant's character, reputation, loyalty to the United States, associates, conduct, intelligence and abilities.

As a result of this investigation, the FBI compiled a file consisting of twelve documents. The first is dated August 18, 1961 and the last is dated September 8, 1961. (App. 13) Most of the information gathered is complimentary toward the Appellant and his family. However, a few sources provided information or opinions that were adverse, and could prove damaging to Appellant in certain contexts.[1]

## II. Privacy Act Request

On September 27, 1975, Appellant sent a letter to his Congressman requesting his assistance in obtaining "any information the Government has" about the plaintiff, pursuant to the Freedom of Information-Privacy Acts. The Congressman forwarded this request to the FBI, who advised him that the request would be processed in line with the current work load of such requests. The FBI informed Appellant that it needed additional identifying data to aid it in locating any documents. Appellant supplied this information, including a notarized signature. By letter dated March 16, 1976, former FBI Director Clarence M. Kelley released to Appellant thirty-six (36) pages of material from the one FBI file pertaining to him. The letter informed him that certain information was withheld as it was exempt from disclosure pursuant to 5 U.S.C. § 552a, *infra.* In particular, it was apparent from the Xerox copies of the FBI files that were delivered to Appellant that the names or identifying facts of all sources who had supplied information to the FBI under an *implied* promise of confidentiality were deleted.

The basic thrust of the Privacy Act of 1974 is to allow individuals access to any records the government may have compiled pertaining to the individual. However, certain material is exempt under this scheme. For purposes of this action, the pertinent exemption is found in 5 U.S.C. § 552a(k)(5),

---

1. One source, who received an express promise of confidentiality, stated that Appellant "will be dropped from the Peace Corps for psychiatric reasons." (App. 73) Other sources advised that Appellant was only an average student, who could have done better, except that he

lacked motivation. (App. 65–66) Another source from the Cook County Department of Public Aid advised that Appellant had difficulty learning, and needed close supervision. (App. 60)

which allows agencies "to exempt any system of records" [2] if they include

(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, *under an implied promise that the identity of the source would be held in confidence;*

5 U.S.C. § 552a(k)(5) (emphasis added).

Since the effective date of the above section was 270 days after December 31, 1974 (88 Stat. 1910) and the investigation of Appellant occurred before 1974, the FBI was relying on the last phrase of this provision, i.e., that the sources to the Londrigan investigation furnished information to the FBI under an *implied promise* that their identity would be held in confidence.[3]

Appellant appealed the decision of Director Kelley to withhold the identity of those who had been interviewed. On March 9, 1977, Richard L. Thornburgh, Acting Deputy Attorney General, United States Department of Justice, advised Appellant that Director Kelley's decision to withhold certain information was affirmed.

The materials in that file now being withheld [excisions only] are considered by me to be exempt from mandatory release pursuant to 5 U.S.C. § 552a(k)(5). This provision pertains to investigatory records compiled solely for the purpose of determining suitability, eligibility or qualifications for Federal employment,

the release of which would reveal the identity of a source who furnished information to the Government under an express or implied promise of confidentiality. I do not consider that release of any of these withheld materials as a matter of my discretion would be appropriate. In addition, information pertaining to individuals other than yourself has been withheld because such materials are outside the definition of "record" contained in the Privacy Act and the release of them to you would, in my opinion, violate the statute. (App. 31)

Appellant filed this action in the District Court on July 24, 1978. On September 15, 1978, on the basis of the affidavit of Special Agent (SA) Charles Wroblewski, a supervisor in the Freedom of Information-Privacy Act Branch, Records Management Division of the FBI Headquarters, and the filed answers to interrogatories, the FBI moved for summary judgment. SA Wroblewski is familiar with Appellant's file at the FBI. The content of the affidavit and answers to interrogatories are discussed in detail in VI, *infra.* It is sufficient at this point to state that the affidavit and answers to interrogatories described FBI policy in 1961, the customers of the agency, its relationship with the people it interviewed, and the needs and expectations of the agency and its sources in 1961. On the basis of such facts the Appellee contended that the sources who were interviewed furnished information under an *implied promise* of confidentiality.

The supporting affidavit and the answers to interrogatories were not contradicted in any respect. On the basis of the uncontroverted record before it, the District Court granted summary judgment for the FBI, holding that upon an examination of the documents at issue, the kinds of people in-

**2.** That exemptions may be based on a "system of records," indicates that exemptions may depend on general policies and practices.

**3.** In the one document where an express promise was provided to the source, the words "Protect Identity" follow the deleted name of the source. Special Agent Wroblewski explained in answering an interrogatory: "If any individual interviewed expressed a belief that he or she feared exposure of their cooperation with the FBI, they would have been expressly assured that their identity and all information that they furnished would remain confidential. This would have been recorded by placing the words "protect identity", "protect by request" or similar language, after the individual's name . . . ." (App. 90)

terviewed by the FBI, the substance of the questions asked, and the fact that the interviews were conducted by the FBI in 1961, all the circumstances indicated that the information had been obtained under an implied promise of confidentiality. (App. 96)

### III. Issues Raised by Appellant

Appellant concentrates on four major issues in his appeal. First, he argues that the disclosure exemption in § 552a(k)(5) is not a blanket exemption; the evidence to support a motion for summary judgment must be directed to the particular circumstances of each investigation and source at issue. Second, he contests the District Court's reliance upon the affidavit and answers to interrogatories to establish that the interviewed sources furnished information under an express or implied promise of confidentiality. He characterizes the FBI procedures as "general policy," insufficient to support a summary motion under Rule 56(e) of the Federal Rules of Civil Procedure. In essence, Appellant contends that SA Wroblewski was incompetent to attest to the facts set forth in his affidavit and answers to interrogatories.

Appellant's next two points attempt to limit the coverage of § 552a(k)(5). Third, Appellant contests the withholding of the names of the sources who only furnished laudatory information, since they would not fear embarrassment toward Appellant because of their responses. Finally, Appellant argues that the Court should compel disclosure of the names of sources supplying material in their official capacities, i.e. credit bureau personnel, school personnel, union officials, state and local law enforcement employees.

The fatal flaw in all of Appellant's reasoning is that he misconstrues the plain meaning of the statute. Much of Appellant's argument stems from an attempt to construe the exemption as requiring a *contractual* promise, either implied or express, between two parties. For example, Appellant's reading of the statute would mean the Court would have to determine what each FBI agent expressly or impliedly promised to each source, and in turn what

each source anticipated, expected, or relied upon regarding the confidentiality of their names and answers. The plain wording of the statute indicates that Congress never intended that "implied promise" should be so construed. As will be established more specifically in V, *infra*, the statute anticipates a *unilateral promise* from the agency that could be impliedly held out to the sources interviewed. The person interviewed need not act solely in reliance upon the promise. As long as it can be established that such information was obtained under an implied promise from the FBI in general, the specific details of what each individual agent or interviewed source perceived is irrelevant. The record developed by the FBI met this burden of proof.

### IV. Procedural Requirements

The responsibility of the trial court in Privacy Act suits was statutorily established in 5 U.S.C. § 552a(g)(3)(A) which provides:

> In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the exemptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

Since a *de novo* determination is required, the court is not bound by agency rulings.

In a Freedom of Information Act case where the plaintiffs also sought disclosure of withheld information from the Department of the Air Force, this Court discussed the role of appellate review. *Mead Data Central, Inc. v. Dept. of Air Force*, 566 F.2d 242 (D.C.Cir.1977). Since FOIA has a similar exemption, 5 U.S.C. § 552(b)(7)(D), and a similar *de novo* review provision, 5 U.S.C. § 552(a)(4)(B), the *Mead Data* discussion is instructive as to this Court's role in this case.

In a FOIA action the district court is not limited to review of the quality of agency decision-making. It decides a claim of exemption *de novo*, and the agency's opinions carry no more weight than those of any other litigant in an adversarial contest before a court. We do not excuse the Air Force's failure to provide Mead Data with sufficient detail about the nature of the withheld documents and its exemption claims at the administrative level, but for purposes of this case those inadequacies are irrelevant. We are not reviewing the agency's decision or even the district court's approval of an agency decision. We are reviewing only the district court's independent and *de novo* decision that the information withheld by the Air Force is indeed protected from disclosure by exemption five. If we are to reverse the trial judge, Mead Data must show that either he incorrectly decided that the requested information was exempt [13] or that it was deprived of the opportunity to effectively present its case to the court because of the agency's inadequate description of the information withheld and exemptions claimed.

[13] In order to show that the district court's decision was incorrect as a substantive matter, Mead must establish that it was either based on an error of law or a factual·predicate which is clearly erroneous.

*Mead Data Central, supra* at 251.

Since no error of law is claimed in this case, the Court is faced only with the task of determining whether the factual finding of the District Court was clearly erroneous, or whether the alleged inadequacy of the supporting affidavit and answers to interrogatories deprived Appellant of the opportunity to effectively present his case to the District Court. I find that the FBI should prevail on both points.

### V. Legal Definitions of "Implied Promise"

In order to better understand whether an implied promise of confidentiality existed in this case, it is essential to consider the exact wording of the statute, and how other courts have defined "implied promise."

The statute very specifically refers to two kinds of *promises*: express and implied. An express promise would include a spoken or written promise by the FBI to the source that his identity would remain confidential.

The key words in the statute for this case are that an agency may withhold the "identity of a source who furnished information ... *under an implied promise* that the identity of the source would be held in confidence." 5 U.S.C. § 552a(k)(5) (emphasis added). This language includes a unilateral promise emanating from the agency. It does not go so far as to require an implied or express contract between the FBI and the source. To so hold would ignore the obvious intent of the statute which in referring to both express and implied promises clearly indicates that in imposing the standard of an "implied promise" Congress did not intend to require the promise to be "express." Had Congress so intended it would have referred to "express" promises in both instances. Also no conditional wording exists; the source need not act upon the condition that his identity remain confidential, or only because of this confidentiality. To establish an implied promise, the source need not even have cared or known that it existed. This plain meaning of the statute immediately precludes any necessity of determining the subjective thoughts of the sources in the Londrigan investigation. All the Court need determine is the direct and circumstantial evidence under which FBI investigations, such as that of Londrigan, were conducted in 1961.

Numerous courts have defined the term "implied" or "implied promise." In *Foute v. Bacon*, 24 Miss. (2 Cushm.) 156, 164 (1852), the Court held that

the law recognizes two kinds of promises, express and implied; the first is the express stipulation of the party making it, to do or not to do a particular thing, the second the law presumes, from some benefit received by the party against whom it is raised . . . .

The key word here is "presumes"—the promise results as a presumption from the facts. This reasoning of the *Foute* court was applied in *David v. E. W. White, Inc.*, 179 Misc. 803, 39 N.Y.S.2d 667, 670 (1943). A manufacturer of lunch wagons subcontracted to have another company install the motors. The subcontractor negligently performed this task. Subsequently, the purchasers of the lunch wagons ordered the subcontractor to repair the motors. Since it was under no legal duty to make the repairs, the court found that the situation created an implied promise from the purchasers to pay the reasonable value of the repairs. Essentially, the purchasers received a benefit from the subcontractor, which raised a *presumption* of payment for this benefit. This should not be confused with a contract, since there is no contract except by legal fiction. This fiction was recognized by the court in *Fitzpatrick v. Dooley*, 112 Mo.App. 165, 86 S.W. 719, 721 (1905), which also held that an implied promise is a disputable legal *presumption* resulting from considerations of equity and custom.

Many other courts have interpreted the term "implied" as used in such phrases as "implied consent" or "implied contract." Their method of determining whether a particular set of facts raises an implication is instructive to this case. For instance, in *Farm Bureau Mut. Ins. Co. of Mo. v. Dryden*, 492 S.W.2d 392, 394 (Mo.App.1973), the Court held that the word "implied" means a necessary deduction from the circumstances, general language, or conduct of the parties. "Implied consent" has been interpreted as consent manifested by signs, actions, facts, inaction or silence which raises a *presumption* that the consent has been given. *Hill v. Arkansas*, 253 Ark. 512, 487 S.W.2d 624, 629 (1972); *In re Seeger's Estate*, 208 Kan. 151, 490 P.2d 407, 414 (1971); *Cowen v. Paddock*, Sup., 17 N.Y.S. 387, 388 (1891). Implied consent is also *presumed* from the parties' course of conduct and relationship. *Allstate Ins. Co. v. State Farm Mutual Automobile Ins. Co.*, 260 S.C. 350, 195 S.E.2d 711, 713 (1973); *Standard Acc. Ins. Co. v. Gore*, 99 N.H. 277, 109 A.2d 566, 570

(1954). Implied contracts are inferred from the parties' conduct and actions, *Kirk v. United States*, 451 F.2d 690, 695 (10th Cir. 1971); *Western Contracting Corp. v. Sooner Const. Co.*, 256 F.Supp. 163, 167 (W.D.Okl. 1966), or dictated by reason and justice. *Arizona Bd. of Regents v. Arizona York Refrigeration Co.*, 115 Ariz. 338, 565 P.2d 518, 529 (1977).

I am aware that to presume a promise, the evidence must be clear and unequivocal. In 1828 the Supreme Court addressed this issue in *Bell v. Morrison*, 26 U.S. (1 Pet.) 351, 7 L.Ed. 174 (1828). A Kentucky statute of limitations permitted the revival of a claim on a debt outside the prescribed time period, if the debtor had made an unqualified acknowledgment of the debt still owing. Such an unconditional acknowledgment would thus revive the original cause of action, and the court would then imply a promise from the debtor to pay the debt. Mr. Justice Story explained for the Court that

[i]f there be no express promise, but a promise to be raised by implication of law, from the acknowledgment of a party, such acknowledgment ought to contain an unqualified and direct admission of a previous, subsisting debt, which the party is liable, and willing, to pay. If there be accompanying circumstances, which repel the presumption of a promise or intention to pay; if the expressions be equivocal, vague and indeterminate, leading to no certain conclusion, but at best to probable inferences, which may affect different minds in different ways; we think, they ought not to go to a jury as evidence of a new promise, to revive a new cause of action. Any other course would open all the mischiefs against which the statute was intended to guard innocent persons, and expose them to the danger of being trapped in careless conversations, and betrayed by perjuries.

*Id.* at 361. We need not go so far in this case as to require express statements from the FBI, since the same concern for "mischiefs" does not exist. However, we do recognize the need for clear and uncondi-

tional evidence of an implied promise for it to exist by legal implication.

Finally, it is helpful to review how other courts have interpreted the term "promise." Some have defined it as an undertaking either that something shall happen, or that something shall not happen, in the future. *See, e.g., Plumbing Shop, Inc. v. Pitts*, 67 Wash.2d 514, 408 P.2d 382, 384 (1965); *Schenley v. Kauth*, 96 Ohio App. 345, 122 N.E.2d 189, 191 (1953); Restatement of Contracts § 2(1) (1932). The District of Columbia Court of Appeals defined "promise" as an express or implied declaration which raises a duty to perform. *Bergman v. Parker*, 216 A.2d 581, 583 (D.C.App.1966).

Through these cases, we discern a standard for determining whether an "implied promise" exists. First, we must determine whether the FBI received a benefit from the sources which could raise a presumption of confidentiality. Second, we must review the surrounding customs, facts, circumstances, equity, signs, action, inaction, course of conduct, relationships, and the nature of the information sought to see whether they indicated an implied promise from the FBI to keep confidential the identities of those who were interviewed. Finally, we must determine whether this evidence is sufficiently clear to meet the burden of raising a legal implication of a promise of confidentiality.

## V. Appellee's Evidence Supporting Its Motion for Summary Judgment

In support of its motion for summary judgment the trial court relied on the answers to interrogatories and the affidavit of SA Wroblewski. The factual statements therein contained were *not contradicted* by Londrigan and are sufficient factually to establish an implied promise of confidentiality.

The affidavit states:

(B) Persons interviewed often assume, quite logically, that the information they furnish is only for the official use of the FBI in the fulfillment of its responsibilities, and that, the identities and the fact of their cooperation with the FBI will not be publicly exposed. Without that im-

plied confidentiality, the fear of such exposure would inhibit the cooperation of otherwise conscientious citizens. Wherever the information would not identify the source, it has been left in the document.

In conducting the background investigation regarding plaintiff's application for the position of Peace Corps Volunteer, the following groupings of individuals were considered to be implied confidential sources: school personnel, personal references, neighborhood and social acquaintances, business associates, and former employees; therefore, their identities and information which would disclose identities were withheld pursuant to exemption (k)(5).

In interviewing the above individuals, the FBI attempted to determine their feelings as to the plaintiff's character, reputation, loyalty, associates and abilities. In order to receive a complete and frank appraisal of plaintiff's background, the persons interviewed must believe that their remarks would not be revealed to the applicant at a later date. If it became known to the general public that an interviewee's candid comments concerning an individual's character, associates, reputation, loyalty, and abilities were at a later date being revealed to the applicant such candid statements would soon dry up and the FBI's ability to conduct thorough applicant background investigations would be thwarted. This potential lack of confidence in the FBI's ability to protect its sources of information could carry over into the other investigative areas which the FBI pursues such as security, intelligence, and criminal investigations and thereby also hinder the FBI's ability to carry out its investigative responsibilities.

(App. 14–15)

The pertinent interrogatory answers are as follows:

*ANSWER TO INTERROGATORY NO. 3: . . .* This investigation was conducted prior to the enactment of the Privacy Act and an implied promise of confidentiality

existed in all interviews the FBI conducted.... (App. 84)

\* \* \* \* \* \*

*ANSWER TO INTERROGATORY NO. 20:*

(a) In 1961, when this investigation was conducted, 100% of the persons interviewed assumed that their identities and the fact of their cooperation with the FBI would not be publicly exposed.

(b) ... zero percent [of the persons interviewed] would assume that their cooperation would be publicly exposed.

(c) The FBI bases the statement [that "persons interviewed often assume ... that the identities and the fact of their cooperation with the FBI will not be publicly exposed"] on a review of the documents pertaining to this investigation, prior investigative experience of SA Wroblewski, and *the FBI's policy in 1961 that all files were considered confidential.* (App. 90) (emphasis added).

\* \* \* \* \* \*

*ANSWER TO INTERROGATORY NO. 23: At the time these interviews were conducted in 1961,* no such law as the Privacy Act was envisioned. *There was no expectation that the identity of anyone who furnished information to the FBI would be divulged.* Individuals, therefore, relied on this implied confidentiality even when supplying information in their employment capacity. Furthermore, these individuals expected that they would be free from unnecessary questions, future harassment, and intrusion into their private lives by members of the public which could result from the release of the fact of their cooperation with the FBI. Quite often, individuals acting in their official capacities and with a desire to assist the FBI, provided information that they were not permitted to release, without prior authorization, according to the internal rules and regulations of the business entity or educational institution. (App. 91) (emphasis added).

None of these factual allegations supplied by the appellee were controverted by the appellant. He introduced no evidence whatsoever which discusses these facts.

The information set out in the Wroblewski affidavit and interrogatories should in and of itself vindicate the FBI decision to withhold the names sought by appellant. In *Miller v. Webster, et al.,* (7th Cir. 1981), the Seventh Circuit very recently held with respect to FBI claims of exemption under a related subsection of the statute herein under discussion,

"FBI affidavits which 'comprehensively set forth the exemptions upon which [the] agency had relied when it excised portions of its file ... and set forth the reasons underlying their use,' were sufficient to sustain FBI claims of exemption.... We find this standard is in keeping with the purpose of the Act as expressed in its legislative history..."

At 627, *quoting Scherer v. Kelley,* 584 F.2d 170, 175–76 (7th Cir. 1978), *cert. denied,* 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1978). In *Miller,* the Special Agent affiant set

"forth the reasons of the FBI in relying on the claimed exemptions, and articulately expresse[d] the concern of the Bureau that such material remain confidential in order to preserve the Bureau's ability to elicit continued public cooperation through such interviews."

*Id.* at 627. The court found the affidavit "responsible and conscientious" and, as such, "sufficient to satisfy the burden of proof imposed on the Bureau by § 552(a)(4)(B)." *Id.*

As in *Miller,* the FBI in the person of SA Wroblewski has in the instant case set forth the exemption relied upon in withholding the names appellant seeks and has specified the reasons underlying the use of that exemption. As in *Miller,* that is, the FBI has met the burden of proof implicit in the language of the exemption invoked. "Unless there is evidence to the contrary in the record, we believe such promises of confidentiality are inherently implicit in FBI" background investigations. *Id.*

Nor is this the extent of the Bureau's case for withholding the names in question.

It is apparent from reading the Wroblewski affidavit and interrogatories that the FBI received a benefit from which a promise of confidentiality may be presumed. Probably the most significant facts which lead to this conclusion are that in 1961 it was the policy of the FBI that *"all files were considered [to be] confidential"* and *"[t]here was no expectation that the identity of anyone who furnished information to the FBI would be divulged." Id.* As recounted in the affidavit, without the promise which was implicit in the FBI's operational policies, sources would fear exposure and thus be inhibited in furnishing candid information. The FBI relied on obtaining a complete and frank appraisal of Londrigan's background from *sources who were under no obligation to provide this.* The fact that the agency received the information was a benefit. Without an across-the-board promise of confidentiality, the FBI would be frustrated in its attempts to perform these background investigations and, more importantly, vital security, intelligence, and criminal investigations.[4] Therefore, in this background investigation we may presume a general implied promise of confidentiality existed because of the benefit received by the FBI.

Upon a review of the relationship between the FBI and the sources, the policy and customs of the agency, and both parties' actions and inactions, it is also evident that an implied promise of confidentiality existed. The most relevant facts are the year, 1961, and the nature of the interrogator, the FBI. The record indicates that at the time of the Londrigan investigation, no one envisioned the enactment of the Privacy Act of 1974. In those times it would have been absurd to anticipate that the FBI could be forced to release information which for years had remained available only for the official use of the agency in fulfillment of its responsibilities. Therefore, it is imperative for us to place ourselves into the mindset of that time—which factual situation is set forth in the affidavit and interrogatories.

The relationship and activity of the agency is also significant. The FBI was, and to a large extent still is, an awe-inspiring entity to the bulk of the populace. Their special agents obtained most of their information from voluntary sources. Most individuals approached by a special agent for questioning at that time would probably not have differentiated between the seriousness of a criminal investigation conducted by the FBI as opposed to a background employment search and would have presumed confidentiality unless disclosure was implicit in the nature of the investigation. The images and expectations on the part of interviewees toward the special agents, i.e. their relationship, existed despite the context of the questions. The attitude of confidentiality was therefore inherent and essential to instill at all times. It is thus concluded that where the FBI for years held itself out as not disclosing information obtained in investigations except where the investigation was for the purpose of disclosure, and abided by that rule during that period of time, the practice and procedure amounted to an implied promise which extended to those being interviewed that information obtained in background employment investigations such as we have here, would be used for official purposes and held in confidence.

It is important to clarify the boundaries of this holding. The same relationship or expectations might *not* exist if the institution gathering the information were a government agency other than the FBI. The same aura of confidentiality or seriousness probably would have been absent had the source been interviewed by the Civil Service Commission or the subject's potential employer. The resulting promise of confidentiality would vary with the agency

---

4. Whether a promise of confidentiality is implied can vary with the nature of the investigation. Naturally in a criminal investigation where the information is sought for disclosure in a criminal trial a presumption of confidentiality of the information would be unusual. However, where informants give information, and where the divulgence of the source might create a hazard to one's life or person, confidentiality whether expressly or impliedly promised is rigidly protected.

and with the nature of the investigation. I would so hold under the realization that the exemption in 5 U.S.C. § 522a(k)(5) is not a blanket disclosure exemption for all investigations prior to 1974.

Therefore, the information supplied by SA Wroblewski concerning the FBI's relationship to sources, actions, policy and customs in 1961 is alone sufficient to establish an implied promise of confidentiality. However, the additional facts to which he attested, i.e., the kinds of sources questioned and the nature of the questions and the information obtained in the respective interviews, adds force to this position. The FBI special agents interviewed school personnel, personal references, neighborhood and social acquaintances, business associates, and former employees. Undoubtedly, many of these persons were still in contact, or would have future contacts, with the subject of the investigation. Without an express or implied promise of confidentiality, it is highly unlikely that they would feel free to render frank answers that might be negative or damaging.[5] Whether this hesitation be from a fear of retaliation or harassment from the subject of the investi-

gation, or an embarrassment at having hurt him in some way, the fact remains that many valuable sources of information would be inhibited and would have cause to shade their responses.[6]

Finally, the nature of the interviews concerning Londrigan included questions as to his character, associates, reputation, loyalty, and abilities. These subjects are highly personal, and their nature reinforces the idea that the FBI would want to instill a feeling of confidentiality in order to obtain frank answers. Appellant has not supplied any persuasive reason why sources giving information in their official capacities, such as school personnel, credit union employees, or personnel office employees would be any less inhibited from releasing information openly of this nature. It is quite logical to assume that such persons would fear harassment or intrusion into their private lives because of the kinds of truthful answers they rendered.

All of these facts are of record and lead inevitably to the conclusion that the FBI in 1961 obtained information from its sources in background employment investigations under an implied promise of confidentiality.

---

5. Appellant attempts to convince the Court that it is inconsistent to find that sources supplying laudatory information acted under an implied promise of confidentiality. However, if the starting point is the relationship established by the FBI at the time, the character of the statements received is irrelevant. After all, the FBI agent would have no way of knowing, until the source has replied, whether the answers would be laudatory, damaging or neutral. In order to receive frank answers, the FBI needed to establish the aura of confidentiality prior to the source's speaking.

 SA Wroblewski addressed this issue in his answer to interrogatories. *All* information was considered confidential.

 Also, to release the identity of individuals furnishing favorable information would tend to negate the claim of confidentiality on the part of those who furnished information of an unfavorable nature. One example would be where there are three personal references furnished by the plaintiff and two provided favorable information; therefore, one provided unfavorable information. To release the identities of the two furnishing the favorable

statements would, therefore, advise plaintiff of the identity of the individual who furnished the unfavorable statement.
 (App. 93) It should also be recognized that truthful appraisals of a subject's abilities is the objective of the interview and if sources have to protect themselves by giving overly laudatory interviews the value of the whole investigation will be greatly reduced.

6. The nature of the derogatory information given in the instant case, see footnote 1 *supra*, is typical of the situation where the person being investigated, since he knows what was said, must have *some* reason for wanting the name of the source. Although the record in this case in no way draws this conclusion, there is always the fear that the subject of an investigation may want the name of the confidential source for the purpose of harassing that person. Where derogatory information is given, and it appears likely that the information was furnished under an implied promise of confidentiality, the Court should be ready to protect the source.

That this conclusion results as a conclusion from a collocation of facts and circumstances in no way detracts from its strength. In fact, the circumstances here fit neatly into the situation envisioned by the drafters of the disclosure exemption in the Privacy Act.[7]

7. During the floor discussion on this amendment in the House of Representatives, 120 Cong.Rec. 36655 to 36658, the following statements and observations were made. Representative Erlenborn of Illinois, the author of the amendment, explained:

> The information, *derogatory or otherwise*, will be made available to the individual. The only portion that will be kept confidential is the name of the one who has given the information in confidence, or such information as might lead to his identity.

120 Cong.Rec. 36656 (1974) (emphasis added). This indicates that the exemption, contrary to the Appellant's contention, does not make any distinction between derogatory or laudatory information, and that the names of those who give information in confidence in both situations will be "kept confidential."

Representative Holifield (of California) stated:

> I think that if we do reveal the sources of confidential information, after we have or an agency has obtained the information under the promise of protecting the source, it would imperil the access to information which we should have.

*Id.* This observation supports a premise in SA Wroblewski's affidavit that the FBI needs to maintain the confidentiality of its sources in order to keep its channels of information open.

Other comments regarding the amendment were made by Representative Erlenborn.

> Only to the extent that the confidential source would be compromised would we keep the name of the individual who is the confidential source or such information as would identify him from the applicant. That information would be kept from the individual seeking information. Otherwise, all the rest of the contents of the file, including any of this derogatory information, would be made available to the jobseeker.

*Id.* at 36657.

> \* \* \* \* \* \*
>
> [I]n the past, of course, an individual never had an opportunity to go into his *security clearance file* or into his *free employment* file. [This recognized prior custom and usage in such cases].
>
> Therefore, the question really never arose.
> In the past there has been lawfully expressed and implied promises of confidentiality given to those who have made statements to investigators.

## VII. Competency of Special Agent Wroblewski to Present This Evidence

Special Agent Wroblewski was a knowledgeable insider and expert on both FBI investigative procedures and Privacy Act requirements, and from examination of agency records constituting public records

> The function of this bill, if it is not amended by the Erlenborn amendment, will be to open up all of those old files so that those statements that were given in confidence will now be made available to the individual.

*Id.*

Finally, the following observation was made by Representative Fascell of Florida who was strongly opposed to the amendment.

> The amendment specifically exempts from the provisions of this bill identity or source of information. There is no such exemption now in the law.
>
> Other Members, just as I have been, have been asked many, many times to give information. Never have I had any Government agency or agent say to me, "Sir, the information you gave me is classified" or "the information will be kept confidential."

*Id.* While Representative Fascell's statement only represented that he had never given information under an *express* promise of confidentiality, Representative Erlenborn replied by stating:

> The gentleman from Florida says that he has never had any promises, express or implied. In that case, his name will be made available if he is one who has given such a statement, because the only thing that would be protected are those confidential sources.

*Id.* Appellant quotes this discussion to support his contention "that Congress did not intend an implied promise of confidentiality to be assumed merely from an FBI investigation." Appellant's Reply Brief at 2. There is no support in the reply for such a conclusion. Representative Erlenborn's reply never specifically addressed FBI investigations in 1961, or the investigatory practices of any agency, particularly as they relate to sources presumably unfamiliar with the intricate workings of the law. He merely responded to Rep. Fascell's statement by explaining that *if* there had not been an express or implied promise of confidentiality there was nothing in subsection (k) to support withholding the name of the source that had supplied information and the source's name "will be made available." His answer is not in any way in conflict with the interpretation that the district court applied in this case. In fact, Rep. Fascell's statement only explains that he has never given information under an *express* promise of confidentiality.

The Congressional debate is thus fully supportive of the foregoing opinion in this case.

and reports [8] had sufficient reliable personal knowledge of the circumstances surrounding FBI investigations in 1961 to attest to the affidavit in this case. The affidavit was thus competent to support a motion for summary judgment under Fed.R. Civ.P. 56(e).[9]

SA Wroblewski had been an FBI special agent doing field investigative work for approximately eight years. During that time he handled complicated cases involving violations of various federal statutes. Subsequent to that job, he was transferred to the Freedom of Information-Privacy Act Branch, Records Management Division, at the FBI Headquarters where he was serving in a supervisory capacity at the time Appellant's lawsuit was filed. His affidavit asserts that the

> statements made herein are based upon my knowledge, upon information available to me in my official capacity, and upon decisions reached in accordance therewith. Through my official duties, I have become personally familiar with plaintiff's FOIPA request directed to the FBI.

(App. 10) Therefore, the evidence presented by the FBI was presented by a qualified expert on the agency and its policies and practices at the time of the investigation and thereafter.

To hold, as Appellant contends, that a detailed search into the individual circumstances surrounding each routine background employment investigation must be conducted, rather than accept an affidavit from one as knowledgeable as SA Wroblewski, is to impose an almost impossible and unnecessary burden on agencies like the FBI. According to the FBI, it receives thousands of Freedom of Information and Privacy Act requests annually.[10] In many cases, requests are made for documents prepared many years ago. In most cases, even if the agents who conducted these routine investigations could be located,[11] human memory being as fallible as it is, it is highly doubtful that they would recall the details of the interview. Finding the persons questioned in each case would be even more difficult. In essence, the Appellant's suggestion would require, in most cases, an exercise in futility.

Two district courts have addressed the issue raised by such circumstances insofar as it relates to a comparable exemption from disclosure in the Freedom of Information Act. 5 U.S.C. § 552(b)(7)(D).[12] In *Olaquibeet A. Lopez Pacheco v. FBI*, 470 F.Supp. 1091 (D.P.R.1979), the Court reviewed similar challenges to an affidavit attested to by a special agent to the FBI.

> [T]o accept Plaintiff's theory that every invocation of subsection (b)(7)(D) must be made by the specific agent who interviewed each source or who personally gave them promises of confidentiality would convert the evidentiary procedure contemplated by Congress into a practical

---

**8.** F.R.Ev. 803 provides: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

**9.** F.R.Civ.P. 56(e) requires that affidavits in support of summary judgments shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

**10.** Appellee's Brief at 27 n.11.

**11.** Only three of the thirteen agents who conducted the investigations in this case are still employed by the FBI. (App. 85–86)

**12.** This section provides that agencies need not disclose under FOIA

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . (D) disclose the identity of a *confidential* source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, *confidential* information furnished only by the *confidential* source.

5 U.S.C. § 552(b)(7)(D) (emphasis added).

impossibility and would require long and time consuming trials even in the clearest cases. We are not convinced that Defendants must meet such·an exacting burden [Footnote omitted] [13]

*Id.* at 1102. Similarly, in *Ramo v. Department of Navy and Department of Justice,* 487 F.Supp. 127 (N.D.Cal., 1979), the Court held that "[t]he affidavit or testimony of one agency official, who is knowledgeable in the way such information is normally gathered, that attests in a detailed manner as to the basis of each claimed exemption," was sufficient for a § 552(b)(7)(D) exemption. At 130. The *Ramo* Court likewise held it was unreasonable to demand that the government must produce statements from the originator of each piece of information excised from a disclosed record. *Id.* Such a task would cost too much in time and resources with only negligible benefits.

The reasoning of those courts, and of the trial court in this case, is clearly proper. SA Wroblewski was competent to attest to the necessary detail regarding the FBI investigation of Appellant and to FBI investigative policies in 1961; the factual data so supplied is sufficient to support the summary judgment of the District Court. In so holding, the finding is reiterated that it is unnecessary to review the subjective thoughts of each person interviewed; we should only be concerned with the facts which support the conclusion that in background investigations covering loyalty and employability, such as we have here, an overall implied promise of confidentiality was extended by FBI policy and practices to the public as a whole.[14] The majority opinion reaches a highly impractical result because it is premised on the false fact that the implied promise must be communicated to every person interviewed. It seems clear to me that the general implied promise held out by the FBI to the public at large is more than sufficient to satisfy the requirement of the statute. *There is no requirement that the implied promise be communicated to each person interviewed.* If Congress had so intended it would have so provided by adding "personally communicated to each person interviewed." What the majority are really holding is that there must be in effect an "express promise"— i.e., communicated to the interviewee. The statute does not so provide.

## VIII. Conclusion

On the basis of the entire record, I would hold that the *de novo* factual determination of the trial court, that the sources supplied information under an implied promise of confidentiality, is supported by competent evidence and was not clearly erroneous. Therefore, I respectfully dissent from the failure to affirm the award of summary judgment for·the FBI.

---

**13.** The *Pacheco* Court went on to quote Judge Gesell in *Morton-Norwich Products, Inc. v. Mathews,* 415 F.Supp. 78, 83 (D.D.C.1976).

"... The Freedom of Information Act must proceed in an atmosphere of confidence in government. If the agency cannot be trusted, the Act will never work. It is a profound mistake to transfer administrative responsibility to judges on the theory that persons employed by the Executive branch are not honest or lack judgment."

470 F.Supp. at 1103. The same logic applies to the deference this Court should give to SA Wroblewski's affidavit.

**14.** If courts do not require more specific affidavits to support a "confidential" exemption under this FOIA provision, where *implied* promises of confidentiality are not referred to, then the facts of the instant case present an even stronger situation in support of the use of such affidavits. As is stated in V, *supra,* determining whether something is "implied" demands a review of surrounding customs, actions, and relationships. This can be achieved without resorting to detailed specifics of each interrogation.