**ROGERS CORPORATION, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 00–1542.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 2001.

Decided Jan. 4, 2002.

---

Steven Ferrey argued the cause for petitioner. With him on the briefs was Lee D. Hoffman.

D. Judith Keith, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was John C. Cruden, Acting Assistant Attorney General.

Before: GINSBURG, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The Rogers Corporation ("the company") petitions for review of the decision of the Environmental Appeals Board assessing a penalty of $281,400 for violation of section 15 of the Toxic Substances Control Act, 15 U.S.C. § 2614 (1994). The company challenges the decision on a variety of grounds. Suffice it to say, the company contends that the Board's affirmance of the grant of the agency's motion for partial accelerated decision, which requires a finding that "no genuine issue of material fact exists," 40 C.F.R. § 22.20(a), was arbitrary and capricious. We agree, and, accordingly, we grant the petition and remand the case to the Board for further proceedings.

**I.**

The parties stipulated to the following facts: The company, a Massachusetts corporation that has its principal place of business in Connecticut, owns and operates a manufacturing facility that produces polyurethane elastomers and foams. During the relevant time period, the company used a heat transfer system known as "HTS 975," which was located in a basement room. The HTS 975 used oil as a

heat transfer medium, and oil occasionally dripped or wept from the pump bearings and then collected on the concrete floor beneath the HTS 975 in a shallow concrete berm. From time to time, the company pumped the oil from the berm under the HTS 975 into drums, sampled the contents of the drums for hazardous waste constituents, and shipped the drums off-site for disposal. From at least 1988 to at least March 1992, analysis of the samples of residual heat transfer fluid taken from the berm did not reveal concentrations of polychlorinated biphenyls ("PCBs") equal to or greater than 50 parts per million ("ppm"). In April 1993, however, sampling of 16 drums of waste oil revealed PCBs in excess of 50 ppm in nine drums. The company was notified of the excessive PCBs in June 1993, and the sixteen drums were shipped off-site for disposal in September 1993. In December 1993, the Connecticut Department of Environmental Protection inspected the company, found PCBs in excess of 50 ppm in two of five samples of oil taken from the HTS 975 room, and cited the company. Four months later, the Department ordered the company to conduct certain studies and to take remedial actions. In response, the company continued to investigate the source of the excessive PCBs and undertook remedial actions.

In September 1994, the Environmental Protection Agency ("the agency") charged the company with improper disposal of PCBs from June 16, 1993, until on or around December 1, 1993 in violation of 40 C.F.R. § 761.60 and § 15 of the Toxic Substance Control Act, 15 U.S.C. § 2614, and proposed a civil penalty of $226,750. The company filed an answer in October 1994, and, pursuant to 40 C.F.R. § 22.15(c), requested a hearing. In its prehearing memorandum, the company stated that it would offer evidence that it had not used any PCB containing heat transfer fluids since 1972, and that the

only logical source of the PCBs in the residual heat transfer fluid was the concrete floor and soil underneath the HTS 975. In a supplemental prehearing memorandum, the company proffered Robert S. Potterton as an expert witness who would "provide an opinion as to the physical/chemical basis for the unexpected appearance, in or about 1993, of PCB concentrations equal to or greater than 50 ppm in the fluid that was pumped from the bermed containment area in the vicinity of HTS 975...." Mr. Potterton would also testify about remediation efforts by the company.

Just short of three years after the agency filed its charge, on September 12, 1997, the company filed a motion for an accelerated decision, pursuant to 40 C.F.R. § 22.20(a). The company sought application of the agency's historic waste exemption for PCB-containing fluids placed in a disposal site prior to February 17, 1978. Anticipating that the agency would rely on *In the Matter of Standard Scrap Metal Company*, TSCA Appeal No. 87–4, 1990 E.P.A.App. LEXIS 8, 1990 WL 303875 (E.P.A. Aug. 2, 1990), the company argued that the phrase "disposal site" did not refer to a narrow subcategory of places for containing PCB-waste spilled or released prior to February 17, 1978. The company pointed to agency regulations proposed December 6, 1994, clarifying that PCBs disposed of prior to April 18, 1978, do not require further disposal action unless a Regional Administrator finds that such historic waste presents a risk to health or the environment from exposure. *See Disposal of Polychlorinated Biphenyls*, 59 Fed. Reg. 62,788 (proposed Dec. 6, 1994) (codified at 40 C.F.R. § 761.50(b)(3)). The company asserted that this court had acknowledged the validity of the proposed rule as a statement of agency policy in *General Electric Co. v. EPA*, 53 F.3d 1324

(D.C.Cir.1995), and that the Environmental Appeals Board had relied on the proposed rule as support for the respondent's position in *In re CWM Chemical Services, Inc.,* TSCA Appeal No. 93–1, 1995 E.P.A.App. LEXIS 20, 1995 WL 302356 (E.P.A. May 15, 1995). As evidentiary support for application of the historic waste exemption, attached to the company's motion for accelerated decision was an affidavit of Gerry L. Langelier, an engineer at the company for 33 years, stating that the company had ceased using PCB-based oil in 1972, and that, since then, oil seepage from the wet seals into the bermed containment area under the HTS 975 had never before the 1993 tests contained PCB concentrations above 50 ppm.

The agency filed an opposition to the company's motion for accelerated decision, a motion to file an amended complaint to increase the duration of the charged violation and the proposed penalty to $300,300 (based on evidence that the spill remained from June 16, 1993, until March 29, 1994, or later), as well as its own motion for a partial accelerated decision on liability. The company opposed the agency's motion for a partial accelerated decision, renewed its argument based on the agency's interpretation of its regulations as reflected in the proposed regulations, and also argued that the agency's inference that a disposal took place in 1993 was unwarranted in light of the undisputed fact that there was no ongoing source of PCBs in the HTS 975. Asserting that the question of why PCBs suddenly showed up in 1993 berm samples was a matter of speculation, the company stated that question was irrelevant because there was no evidence of any spill or leak at the company in 1993. An attached affidavit from its engineer stated that no piping containing PCB had been connected to the HTS 975 after the system was drained of PCB oils in 1972 and that, upon cleaning the HTS 975 room floor and

the discovery of cracks in the sump area, the company discovered PCB contaminated soil underneath the floor.

By Order of November 13, 1997, an administrative law judge ("ALJ") granted the agency's motions to amend the complaint and for partial accelerated decision on liability. The ALJ denied the company's motion for accelerated decision, and the company's request for oral argument, inasmuch as the company had not set forth a basis for the request "other than its generalized assertion that it is entitled to judgment as a matter of law in this matter." 1997 Order on Liability at 2. The ALJ summarized the stipulated facts and observed that the parties disagreed as to the legal inferences to be drawn therefrom. Noting that the company had offered "no direct evidence showing when the uncontrolled discharges at issue took place or how these discharges were caused," the ALJ concluded that "the only plausible explanation for the presence of PCBs at regulated levels in 1993 after years of lower levels ... is that there was an uncontrolled discharge in 1993." *Id.* at 23. Because the company failed to dispose of the PCB-contaminated oil in the prescribed manner, the ALJ found that there was an ongoing violation of the disposal requirements of § 761.60(a). The ALJ rejected the company's attempt to invoke the historic waste exemption because (1) the berm under the HTS 975 was not a disposal site within the meaning of the exemption; and (2) the company had failed to carry its burden of showing that the PCB spill occurred prior to February 17, 1978. Of the two causation theories suggested to the ALJ upon review of the evidence, the ALJ concluded that the company's leaching-up theory, whereby PCBs had leached up from the concrete floor and soil into the oil in the berm, "strains the imagination to envision," while the agency's theory that

increased production had dislodged residual PCBs remaining inside the ·HTS 975 "appears far more likely." *Id.* at 24–25. The ALJ accordingly found that there were no genuine issues of material fact, and, upon rejecting the company's statute of limitations and due process arguments, concluded that the agency was entitled to judgment as a matter of law on liability.

During the penalty phase of the proceedings in April 1998, the company attempted to introduce new, exculpatory evidence that would show that the excessive PCBs in 1993 resulted from contamination of the samples by pre–1978 PCBs that had collected in the concrete and soil beneath the berm. The company proffered, consistent with the ALJ's ruling that the new evidence would be considered only with regard to the penalty, expert evidence relevant to the duration of the violation. The proffered evidence was twofold: (1) that, contrary to the agency's theory that oil continued to drip and come into contact with PCB-contaminated oil in the berm, which under the anti-dilution provision results in a 286–day violation, the State's sampling method in December 1993 entrained into the sample PCB-contaminated concrete, resulting from the previous use of PCBs at the facility and their release into the berm; and (2) that, to a reasonable degree of scientific certainty, Mr. Potterton opined that the company's change in its method of collection of oil, from one type of pump to a more efficient wet/dry vacuum system, which was a more aggressive collection procedure, directly resulted in PCB levels over 50 ppm by entraining concrete particles and dust and introducing oils from cracks in the immediate surface of the slightly porous, PCB-contaminated concrete. The ALJ imposed a penalty of $281,400.

The Environmental Appeals Board ("Board"), upon *de novo* review, affirmed the 1997 Order on liability and the $281,400 penalty. The Board rejected the company's contention that the Board should consider all the evidence in the administrative record including its new evidence explaining the source of the PCB concentrations in excess of 50 ppm, ruling that its review of an accelerated decision will "generally" be limited to the evidence and arguments in the administrative record at the time the accelerated decision was made. The Board also rejected the company's contention that the ALJ had erred in refusing to consider relative to liability the new evidence proffered at the penalty hearing, ruling that the law of the case doctrine permitted the ALJ to reject the company's new exculpatory evidence once liability had been determined. The Board further ruled that the company had failed to meet its burden of production and persuasion to show as an affirmative defense that the historic waste exemption applied. Based on the evidence that PCB contamination had been found in the waste oil in previous years and that production had increased significantly in 1993, and in view of the company's failure to carry its burden of showing that the PCBs were released prior to February 17, 1978, the Board concluded that the ALJ had reasonably inferred that the excessive PCBs came from oil weeping from the HTS 975 rather than PCBs leaching up from the concrete and soil beneath the floor. Finally, the Board declined to apply the regulations effective August 28, 1998, because the complaint had been filed and liability determined before the new regulations became effective. The Board did not rule on the ALJ's alternative holding that the company was not entitled to the historic waste exemption because the berm was not a proper disposal site.

## II.

On appeal, the company contends that the ALJ erred in granting the agency's

motion for accelerated decision on liability by making, with no supporting evidence, a self–described technical inference that PCBs must have spilled in 1993, and then blocking all contrary evidence that the company sought to put in the record. The company maintains that the ALJ's reliance on the agency's inference was not only contrary to the nature of accelerated decisions, which the agency acknowledges are like summary judgment, but also contrary to the agency's own 1979 regulatory scheme, which presumed that PCB-containing oil would flush completely from the company's heat transfer system within three months of the introduction of non-PCB oils. The company also contends that the agency could not shift its burden of proof as to its prima facie case, as was done in *Standard Scrap,* nor penalize the company for historic PCB contamination in the face of undisputed evidence that its source was pre–1978 PCB oil. The company further maintains that the agency's clarification of its regulations on the historic waste exemption applies *ab initio,* citing Supreme Court and agency precedent. Finally, the company contends that the agency impermissibly blocked subsequent key evidence, and that it was a violation of the company's due process right to fair notice to penalize the company for an historic spill.

### A.

The Toxic Substances Control Act ("Act"), 15 U.S.C. §§ 2601–2692 (1994), provides for regulation of the use and disposal of toxic substances prior to their manufacture, processing, distribution, and use in order to protect human health and the environment. Section 5 goes so far as to bar, with only limited exceptions, the manufacture of a new chemical substance or new use prior to notice to the Administrator who, upon finding that there is a reasonable basis to conclude such action

presents or may present an unreasonable risk of injury to health or the environment, may prohibit or place restrictions on its manufacture, processing, or distribution. 15 U.S.C. § 2604. The Act gives special attention, however, to PCBs in view of the seriousness of their threat to human health and the environment. *See Envtl. Def. Fund, Inc. v. EPA,* 636 F.2d 1267, 1271 (D.C.Cir.1980). Section 6 sets forth a detailed scheme to dispose of and phase out PCBs, and directs the Administrator to promulgate rules within six months after January 1, 1977 (the Act's effective date), prescribing methods of disposal and marking of PCBs. 15 U.S.C. § 2605(e). As relevant here, § 15 identifies prohibited acts, including failing to comply with the Administrator's rules and orders. *Id.* § 2614(1). The Act authorizes the assessment of civil penalties not to exceed $25,000 for each violation as well as criminal prosecution for knowing or willful violations, and requires prior written notice of a proposed civil penalty for violation of a prohibited act and a hearing in accordance with § 554 of the Administrative Procedure Act, 5 U.S.C. § 554. 15 U.S.C. § 2615.

In 1978, the agency promulgated the first of two sets of regulations to carry out § 6(e). *See Envtl. Def. Fund,* 636 F.2d at 1272. The first regulations, the so-called "Disposal Regulations," covered pure PCB compounds as well as materials contaminated with at least 500 ppm of PCBs. *Id.* Explaining that it chose this regulatory cutoff in order to regulate disposal of most PCBs "as soon as possible," *Preamble to Final Disposal Regulations,* 43 Fed. Reg. 7,151 (1978), the agency warned that it was considering a new cutoff "possibly in the range of 50 ppm or below" for the proposed "Ban Regulations." *Id.* In June 1978, the agency proposed regulations with a 50 ppm cutoff, *see* 43 Fed. Reg. 24,813

(1978), and this cutoff remained in the final rule. *See Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions,* 44 Fed. Reg. 31,514, 31,543 (1979).

As amended, the regulations in effect in 1993–94 also contained a 50 ppm cutoff, and defined "disposal" to mean "intentionally or accidentally to discard, throw away, or otherwise complete or terminate the useful life of PCBs." 40 C.F.R. § 761.3 (1993). Subpart D set forth the disposal requirements, defining "[s]pills and other uncontrolled discharges of PCBs at concentrations of 50 ppm or greater [to] constitute the disposal of PCBs." *Id.* § 761.60(d)(1). A prefatory note to Subpart D stated that PCB items that have been placed in a disposal site are considered to be "in service" for purposes of Subpart D, and that Subpart D does not require "removal of PCBs and PCB items from service and disposal earlier than would normally be the case." *Id.* pt. 761, Subpart D (prefatory note). Subpart G, regulating spill cleanup, requires the cleanup of PCBs within 48 hours of notice or awareness of a spill. *Id.* § 761.125(c).

The Board interpreted the prefatory note in Subpart D of the disposal regulations in *Standard Scrap,* 1990 E.P.A.App. LEXIS 8, 1990 WL 303875. The case involved a civil enforcement proceeding under § 16(a) of the Act charging violations of 40 C.F.R. § 761.60 and 15 U.S.C. § 2614. *Id.* at *1–*2. The Board stated that "[f]rom the unexplained presence of PCBs in the soil, it can be inferred that one or more 'uncontrolled discharges' of PCBs took place." *Id.* at *6. Under § 761.60(d) of the regulations, the Board ruled, such a discharge amounts to an improper disposal. *Id.* Standard Scrap argued that the PCBs at issue fell within the historic waste exemption provided in the prefatory note to Subpart D. *Id.* at

*8. The Board disagreed. The Board stated that the historic waste exemption is available only as an affirmative defense, and that the respondent bears the initial burden of production and the ultimate burden of persuasion on the applicability of the exemption. *See id.* at *10. Because Standard Scrap had failed to show by a preponderance of the evidence that the PCBs in the soil samples were "placed in a disposal site" prior to February 17, 1978, the Board ruled that it could not avail itself of the exemption. *Id.* at *13. In the alternative, the Board held that "a 'disposal site' is something more than a place where PCBs have been accidentally discharged." *Id.* at *21.

Effective August 28, 1998, the agency amended the PCB regulations. *See* 63 Fed. Reg. 35,384 (1998) (codified in scattered sections of 40 C.F.R. Part 761). Comments on the regulations as proposed in December 1994 had urged clarification of the prefatory note in light of the Board's decision in *Standard Scrap. See* 59 Fed. Reg. 62,788, 62,792. The 1998 regulations deleted the prefatory note and provided that sites where PCBs have been placed in a land disposal facility, spilled, or otherwise released to the environment prior to April 18, 1978, are presumed not to present an unreasonable risk of injury to health or the environment from exposure to PCBs at the site, and do not necessarily require further disposal action unless, on a case-by-case basis, the Administrator makes a finding that spills, leaks, or other uncontrolled discharges, such as leaching from a pre–1978 disposal site, constitute ongoing disposal that may present an unreasonable risk of exposure to PCBs. 40 C.F.R. § 761.50(b)(3)(i)(A) (2000). The regulations further clarified the burden on the respondent, providing that "[t]he owner or operator of a site containing PCB remediation waste has the burden of proving the date that the waste was placed in a

land disposal facility, spilled, or otherwise released into the environment[.]" *Id.* § 761.50(b)(3)(iii).

**B.**

 Under the agency's Consolidated Rules of Practice, an ALJ may issue an accelerated decision if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* 40 C.F.R. 22.20(a). The Board has construed an accelerated decision to be in the nature of summary judgment, and has adopted the formulation of the Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), construing Federal Rule of Civil Procedure 56. *See In re BWX Tech., Inc.*, RCRA (3008) Appeal No. 97–5, 2000 E.P.A.App. LEXIS 13, at *34–*41, 2000 WL 365958 (E.P.A. Apr. 5, 2000). Thus, the movant is entitled to an accelerated decision only if it presents "evidence that is so strong and persuasive that no reasonable [factfinder] is free to disregard it." *Id.* at *38–*39. Evidence not too lacking in probative value must be viewed in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 251, 255, 106 S.Ct. 2505. Although the finder of fact may draw inferences from the evidence, they must be "reasonably probable," *BWX*, 2000 E.P.A.App.LEXIS 13, at *45 n. 22, and based on more than speculation. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *BWX*, 2000 E.P.A.App. LEXIS 13, at *45 n. 22; *In re Clarksburg Casket Co.*, EPCRA Appeal No. 98–8, 1999 E.P.A.App. LEXIS 23, at *28, 1999 WL 504709 (E.P.A. July 16, 1999). Summary judgment is inappropriate when contradictory inferences may be drawn from the evidence. *See,*

*e.g., Londrigan v. FBI*, 670 F.2d 1164, 1171 n. 37 (D.C.Cir.1981).

To prevail, then, on a motion for accelerated decision on liability, the agency "must show that it has established the critical elements of [statutory] liability and that [the respondent] has failed to raise a genuine issue of material fact on its affirmative defense...." *BWX*, 2000 E.P.A.App. LEXIS 13, at *43. As to the affirmative defense, the Board has explained that "the [agency's initial] task is to show that there is an absence of support in the record for the defense." *Id.* at *44 (citing *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548). "If the [agency] satisfies this burden, [the respondent], as the non-movant bearing the ultimate burden of persuasion on its affirmative defense, must meet its countervailing burden of production by identifying 'specific facts' from which a reasonable factfinder could find in its favor by a preponderance of the evidence." *Id.*

The evidence before the ALJ on liability consisted of the pleadings, the parties' joint stipulation of July 3, 1997 and attachments, and two affidavits of the company's engineer, Mr. Langelier. In addition, the company proffered the expert testimony of Mr. Potterton to the effect that there was a physical and chemical basis for the unexpected appearance in 1993 of PCB concentrations in excess of 50 ppm, and, thus, no new spill or uncontrolled discharge in 1993. The undisputed evidence shows that PCB concentrations found in samples taken from the berm under the HTS 975 between April and December 1993 exceeded 50 ppm. The undisputed evidence also shows that the company had ceased using oils containing PCBs in 1972, and thereafter it had properly flushed its system in 1977 and 1988, and that the samples taken through 1992 had shown PCB concentrations of less than 50 ppm. Further, there was evidence from the company's manager

of environmental engineering that the company had "dramatically" increased its production in 1992, running the HTS 975 for 24 hours a day, 7 days a week, through 1993 and into 1994.

█ The ALJ granted the agency's motion for partial accelerated decision, relying on *Standard Scrap*, 1990 E.P.A.App. LEXIS 8, at *6 n. 6, in which the Board stated that the agency presents a prima facie case of a violation by showing that the samples contain PCBs in excess of 50 ppm and that the PCBs were not disposed of in a proper site, a conclusion that may be inferred from where the PCBs were found. The Board, on *de novo* review, approved of the ALJ's reliance on the inference that because there was an unexplained presence of PCBs on the concrete floor, one or more uncontrolled discharges of PCBs took place. Ruling that the timing of an improper disposal is an element of the historic waste affirmative defense, not a part of the agency's prima facie case, the Board agreed that the company had failed to meet its burden of showing entitlement to the historic waste exemption. Pretermitting the correctness of the Board's position on the parties' burdens, we hold that the Board's conclusion that the administrative record during the liability phase of the proceedings did not present a genuine dispute of material fact was erroneous, and thus its grant of the agency's motion for accelerated decision was arbitrary and capricious. *See Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 282–83 (D.C.Cir.1981); 5 U.S.C. § 706(2)(A).

The company presented undisputed evidence that it had not introduced any PCB-containing heat transfer fluids since 1972 and that the results of its flushing, refilling, and testing of the HTS 975 through at least 1992 had shown PCB concentrations of less than 50 ppm. In addition, the company presented evidence that it had discovered cracks in the concrete berm and that PCB concentrations in the soil below were very high. In light of this evidence, the company's inference that the increase in PCBs was caused by PCBs leaching up from the PCB-rich concrete and soil into the berm, rather than leaking down from the HTS 975, would appear to raise a disputed issue of material fact. Any doubt is, in any event, dispelled by the company's proffered expert testimony in its pleadings that itself raised a material question as to whether an uncontrolled discharge had occurred in 1993. Neither the Board nor the ALJ nor the agency on appeal challenge the sufficiency of the proffers, but rather the agency defends the Board's decision on the ground that the company "failed to proffer ... alleged evidence in support [of its causation theory]." Resp't's Br. at 46. Contrary to the agency's argument, and the ALJ's finding, the company both proffered evidence and a theory about how the samples contained excessive concentrations of PCB in the absence of a spill in 1993. By affidavits, the company, in addition, introduced evidence to support its theory.

The company's evidence that it had not introduced PCB–containing fluid into its system since 1972 and that it had discovered PCB-rich soil below the berm and cracks in the berm could not be dismissed as "a *scintilla* of evidence." *BWX*, 2000 E.P.A.App. LEXIS 13, at *40. The evidence showed that, prior to 1993, samples from the berm contained only PCB concentrations below 50 ppm. The ALJ concluded, and the agency maintains on appeal, that the presence of PCBs in unregulated quantities contradicted the company's "assertion" that it had not used PCB-containing fluids since 1972. Not so. Unlike *Standard Scrap*, in which there was evidence that PCB-containing fluid had been contemporaneously intro-

duced into the system, *Standard Scrap,* 1990 E.P.A.App. LEXIS 8, at *13–*14, here there was undisputed evidence, which the ALJ must credit, that no such fluids had been introduced. That PCBs were detected at below 50 ppm for twenty years—viewing the evidence in the light most favorable to the company—does not contradict the inference from the company's evidence that the presence of PCBs in 1993 was linked to excessive PCBs in the soil or concrete resulting from pre–1978 PCB usage. In view of the company's evidence and its proffered expert testimony, the agency could not dismiss the company's theory that the PCBs leached up from the berm as speculative. Put otherwise, once the company presented evidence that there was no new source of PCBs in excess of 50 ppm because it stopped using PCB-containing oil in 1972, and proffered that there was a "physical/chemical" explanation for the presence of PCBs in excess of 50 ppm in 1993, the agency was not entitled to an accelerated decision on liability in the absence of either evidence that a spill had occurred in 1993 or other evidence sufficient to show that no reasonable factfinder could conclude by a preponderance of the evidence that any spill was historic.

In finding liability, the ALJ did not rely on contrary evidence from the agency. The ALJ instead inferred from the company's evidence, and the Board agreed, that the increased production resulted in a spill in 1993. Yet the ALJ's inference was based on nothing more than speculation. The agency offered no technological or other evidence to show either that the increased use of the HTS 975 was related to the increased PCBs in the berm, or that the wet seals harbored PCBs until dislodged by the increased production. As the Board observed, the evidence was "very limited," and clearly there was none to support the inference that the PCBs had been stuck inside the HTS 975 for twenty-one years and had suddenly come loose other than the samples themselves. Given the company's undisputed evidence of its discontinuance of PCB-based oil in 1972, the agency was not entitled to an accelerated decision on liability based on the speculative notion that PCBs in the HTS 975 could affect the samples more than twenty years after termination of the use of PCB-containing oil. *See BWX,* 2000 E.P.A.App. LEXIS 13, at *38–*39.

The company's evidence, when viewed in the light most favorable to the company, as the ALJ and Board were required to do on accelerated decision, created a genuine issue of material fact whether the company had met its burden of proving its affirmative defense that the spill was historic. Because the company's evidence presented a disputed issue of material fact regarding the timing of the spill that led to the presence of PCBs in excess of 50 ppm in 1993, and thus, a disputed issue whether a spill had occurred in 1993, neither the Board nor the ALJ could find that "no genuine issue of material fact exists." 40 C.F.R. § 22.20(a). An accelerated decision, like the grant of summary judgment, is inappropriate when there is a disputed issue of material fact giving rise to conflicting inferences and a choice among them would amount to fact finding. *BWX,* 2000 E.P.A.App.LEXIS 13, at *44. The Board's affirmance of the finding of liability, resting on both the ALJ's inference that "the increased PCB levels likely came about as a result of the residual PCBs in the HTS 975 being dislodged by increased production" and the ALJ's rejection of the company's proffered inference, was exactly that—an improper choice between two competing theories as to the source of the PCBs. Although a factfinder may be entitled, on cross motions for accelerated decision, to decide

among reasonable inferences where the evidence is fully developed, the case did not come before the ALJ in this posture. *See BWX*, 2000 E.P.A.App. LEXIS 13, at *20 n. 10. Both the ALJ and Board relied on the company's assertions that no genuine issues of material fact existed and that "[w]hy the PCBs suddenly showed up in 1993 berm samples is a matter of speculation and in any case is irrelevant to this case." Board's Order (Nov. 28, 2000) (quoting Resp. to Partial Accelerated Decision Mot. at 3 n.2). These statements were made in the context of the company's legal argument that the agency bore the burden of proving that a spill took place in 1993. Once the company lost that legal argument, there was no basis for the ALJ or Board to conclude that the company had conceded that there was no dispute as to the source of PCBs, particularly in view of the fact that prior to the 1997 Order on liability the company proffered additional evidence regarding the chemical and physical basis for the 1993 PCB concentrations.

Although the ALJ ruled alternatively that the company was not entitled to the historic waste exemption because the berm was not a proper disposal site, the Board on *de novo* review did not adopt this alternative holding. Whether the company can, on remand, meet its burden of showing that it is entitled to the historic waste exemption remains to be seen. At this stage, we need hold only that the Board erred in affirming the accelerated decision on liability. Because we hold that the decision the Board invoked as "law of the case" must be revisited because it was improper for the ALJ to grant the agency's motion for accelerated decision based on the evidence presented, on remand there will be no occasion to revisit the question whether the ALJ properly could exclude new liability evidence at the penalty phase, and hence we need not address whether the Board and ALJ erred in con-

sidering the law of the case argument. Further, because the 1998 regulations are now final, we need not address whether the ALJ and the Board should have considered the company's reliance on the proposed regulations as reflecting agency policy.

Accordingly, we grant the petition and remand the case to the Board for further proceedings.